[No. 37260-2-I.    Division One.    September 15, 1997.]
THE STATE OF WASHINGTON, *Respondent*, v. JASON PAUL HAACK, *Appellant*.

---

*Eric J. Nielsen* of *Nielsen, Broman & Associates, P.L.L.C.*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Lee D. Yates, Deputy*, for respondent.

KENNEDY, J. — Jason Haack appeals his conviction of first degree burglary and first degree assault. Haack contends that the trial court improperly included accomplice language in the assault definition and "to convict" instructions; that the State failed, at the suppression hearing, to prove that he was given and voluntarily waived his

*Miranda*[1] rights; and that the court erred in overruling his objections to various hearsay statements at trial. We conclude that the challenged instructions contain correct statements of the law of accomplice liability, that the trial court did not err in admitting Haack's statements at trial, and that the trial court's evidentiary rulings with respect to hearsay were not erroneous in the circumstances of this case. Accordingly, we affirm.

## I

Jason Haack was charged by information with first degree burglary and first degree assault for breaking into an apartment with his brother and attacking Ernie Castro with a knife.[2] The trial court denied Haack's pretrial motion to suppress statements he made the day of the crime from the hospital while recovering from a stab wound. The jury found Haack guilty on both counts, finding by special verdict that he had been armed with a deadly weapon at the time of the commission of both crimes. Haack was sentenced within the standard range, and now appeals. Such additional facts as are necessary to an understanding of this opinion will be stated in connection with our discussion of each of the issues raised in this appeal.

## II

1. *Did the trial court err by including accomplice language in the "to convict" and definition instructions for first degree assault?*

■ Haack contends that the trial court erred by including accomplice language in the "to convict" and definition instructions for the first degree assault charge. Haack argues that the instructions incorrectly stated the law by

---

[1]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966).

[2]Haack was acquitted on a third charge, which is not the subject of this appeal. Haack's brother has been missing since the incident.

permitting the jury to convict him without finding that either he or his brother individually committed all of the elements of the crime, i.e., Haack argues that under the instructions the jury could have convicted by assigning the requisite mental state, intent to inflict great bodily harm, to one of the participants and the required act, assaulting another thereby inflicting great bodily harm, to the other participant. He further argues that the instructions commented on the evidence. Instruction 15 defined assault as follows:

> A person commits the crime of assault in the first degree when, with intent to inflict great bodily harm, that person *or an accomplice* assaults another and inflicts great bodily harm or assaults another with a firearm or with a deadly weapon or by any force or means likely to produce great bodily harm or death.

(Emphasis added). Instruction 17, the "to convict" instruction, provided in pertinent part:

> To convict the defendant of the crime of assault in the first degree, . . . each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That . . . the defendant *or an accomplice* assaulted Ernie Castro;
>
> (2) That the defendant *or an accomplice* acted with intent to inflict great bodily harm[.]

(Emphasis added). The defense objected to both instructions at trial. Jury instructions are sufficient if, when read as a whole, they accurately state the law, are not misleading, and permit each party to argue its theory of the case. *State v. LeFaber*, 128 Wn.2d 896, 903, 913 P.2d 369 (1996).

Although we agree with Haack that these two instructions, read together, would allow the jury to convict based on splitting the elements of the crime between Haack and his brother, such is not an incorrect statement of the law of accomplice liability. The hypothetical used by the State in its responsive brief accurately illustrates

the law of accomplice liability in Washington: Where several people beat up on a victim at the same time and the victim suffers great bodily injury from the beating, it may not be possible for the State to prove which person was responsible for inflicting the life-threatening injury; it is sufficient to convict all of the participants if the State can prove that the life-threatening injury was inflicted by one or more of the participants during the beating and that at least one of the participants intended to inflict great bodily harm. In *State v. Carothers*, 84 Wn.2d 256, 264, 525 P.2d 731 (1974) our Supreme Court said:

> The legislature has said that anyone who participates in the commission of a crime is guilty of the crime and should be charged as a principal, regardless of the degree or nature of his participation. Whether he holds the gun, holds the victim, keeps a lookout, stands by ready to help the assailant, or aids in some other way, he is a participant. The elements of the crime remain the same.

Accomplice liability and principal liability are not alternative means of committing a crime. *Carothers*, 84 Wn.2d at 262. As long as there is sufficient evidence to support the giving of an accomplice instruction, jurors are not required to determine which participant acted as a principal and which acted as an accomplice. *Carothers*, 84 Wn.2d at 264; *State v. Bockman*, 37 Wn. App. 474, 495, 682 P.2d 925 (1984); *State v. Hoffman*, 116 Wn.2d 51, 103, 804 P.2d 577 (1991). Jurors need only conclude unanimously that both the principal(s) and the accomplice(s) participated in the crime, but need not be unanimous as to the manner of that participation. *Hoffman*, 116 Wn.2d at 104.

Thus, in the hypothetical beating case contained in the State's responsive brief, some jurors could believe that Participant A, who wore heavy boots, inflicted great bodily injury on the victim without intending to do so by aiming a kick at the victim's buttocks but hitting the victim's spinal column instead, whereas Participant B, who intended to inflict great bodily injury because he hated

the victim failed to do so only because he was wearing soft-soled sneakers and because the blows he struck landed, by happenstance, in nonvital areas of the victim's body. Other jurors could believe that Participant B, although he hated the victim, wanted to inflict only a few bruises, whereas Participant C, who tried to stab the victim with a knife but missed and stabbed another participant instead, bore the requisite intent as evidenced by his use of the knife and his threatening language during the attack. So long as the State proved beyond a reasonable doubt to the satisfaction of all of the jurors that at least one of the participants intended to inflict great bodily harm and at least one but not necessarily that same participant inflicted great bodily harm during the attack on the victim, the jury with its differing viewpoints as to what actually happened could rationally convict all the participants of first degree assault, including Participant D, who struck no blows and who did not intend to inflict great bodily harm, but who acted as a lookout to alert the remaining participants if the police should arrive. *See Carothers*, 84 Wn.2d at 264.

In the instant matter, the State's evidence showed that Jason Haack and his brother Jerry kicked in the double-locked front door of the townhouse where the victim Ernie Castro was staying, while yelling obscenities at Castro. After entering the dwelling, the two confronted Castro, who noticed that Jerry was holding a knife in his hand. Castro also had a knife. Castro ran downstairs and both Haack brothers ran after him. Jason Haack tackled Castro from behind and began to wrestle with him. At some point Jason Haack was himself stabbed with a knife. As Ernie was struggling with Jason, Jerry Haack attacked Ernie from behind, stabbing him eight times, once in the neck, once in the right torso, and six times in the right back and chest. While stabbing Ernie, Jerry said, "You want to stab my brother, you motherfucker." One of the stab wounds resulted in a collapsed lung. Ernie was airlifted to the trauma unit at Harborview for emergency treatment; he survived his potentially life-threatening wounds.

By the State's theory at trial, Jason Haack was the accomplice to the first degree assault on Ernie, and brother Jerry, who actually inflicted the eight stab wounds, was the principal. The defense theory was that if Jason Haack were present during the attack at all, he was merely present to beat Ernie up, not to stab him. On this evidence and in light of these theories at trial, it is highly unlikely that any juror concluded that anyone other than Jerry Haack both possessed the requisite intent and did the stabbing, but even in the unlikely event that some jurors concluded that Jerry stabbed Ernie eight times without the requisite intent to inflict great bodily injury, and that Jason Haack, based on his motive, which we will discuss later in this opinion, was the only participant who had the requisite intent, there was no instructional error.

Because accomplice liability was a contested issue, Haack argues that the inclusion of the accomplice language in the definition and "to convict" instructions was a comment on the evidence. When an instruction assumes as true something which is in dispute, it is a comment on the evidence. *Martin v. Kidwiler*, 71 Wn.2d 47, 50, 426 P.2d 489 (1967); *State v. McDonald*, 70 Wn.2d 328, 330, 422 P.2d 838 (1967). But neither Instruction 15 nor Instruction 17 assumed as true that Haack or his brother acted with an accomplice. Instruction 15 told the jury that a person commits first degree assault if that person or an accomplice does certain things. Similarly, Instruction 17 told the jurors that they could convict the defendant of first degree assault if they found beyond a reasonable doubt that he or an accomplice met all the elements listed therein. The instructions in this case are nothing like the instruction in *McDonald*, which told the jury that it could consider evidence of the defendant's flight from prosecution and affirmatively stated that "[e]vidence has been offered of . . . escape . . . or attempted escape" despite the fact that the evidence on that issue was conflicting. *McDonald*, 70 Wn.2d at 330. Here, in contrast, the instructions did not tell the jury that an accomplice existed, but informed the jurors under what circumstances they could

find that an assault in the first degree had occurred and that Haack was guilty of it.

Haack's arguments border on the frivolous. We fail to understand, under Haack's theory of the applicable law, how the court could ever properly instruct as to accomplice liability where the evidence is conflicting and accomplice liability is at issue. One could just as well argue that defining assault might lead the jury to assume that the judge believes an assault to have been committed, or that by setting forth the elements of the crime the judge believes that the crime has been committed and that it has been committed by the defendant who is on trial.

2. *Did the trial court err in concluding that Haack was fully advised of and voluntarily waived his Miranda rights when he made verbal statements while in the hospital?*

On the day of the incident, after being informed that Haack had stabbed Castro and was himself in the emergency room suffering from a knife wound, King County Police Detective Robert Corey went to the hospital and waited until Haack was brought out of surgery to ask him some questions. During his testimony at the suppression hearing, Detective Corey described Haack as awake, conscious, alert and able to speak clearly, although obviously in pain. The detective asked Haack if he would be willing to talk about how he had become injured. Haack responded that he would do so only in a selective fashion, answering those questions that he wanted to answer and refusing to answer any questions that he did not want to answer. Detective Corey then read Haack his *Miranda* warnings from a pre-prepared form, and asked Haack whether he understood them. Haack replied that he understood his rights. When Detective Corey asked Haack whether he wished to cooperate with charges against the person who stabbed him, Haack replied that he would "think about it." Haack responded to a series of questions by giving a rather detailed account of how he had sustained his

injuries. Haack claimed that he had been jumped in a parking lot by strangers. Upon further questioning, Haack described one of his attackers as a bald-headed Mexican whose name may have been Ernie. He denied ever entering the apartment of Ernie Castro. He claimed only one knife was used in the incident. When pressed about the number of knives, Haack chose to terminate the questioning. Detective Corey honored the request and asked no further questions.

Although the detective obtained Haack's signature on a medical information release form, Haack was not asked to sign the preprinted acknowledgment and waiver of rights form, which the detective had with him.

Haack claimed at the suppression hearing that he remembered speaking with Detective Corey but did not recall being read his rights. He stated that during the questioning he was still feeling the effects of the alcohol he had drunk the prior evening and was in a lot of pain. Haack testified that he remembered some details of the conversation but not others, and admitted that Detective Corey probably had a better recollection of their conversation than did Haack.

The trial court found Detective Corey, but not Haack, to be credible, stating that Haack's memory at the suppression hearing was "extremely selective" and that his demeanor was "questionable." The court concluded that Haack fully understood and knowingly waived his right to remain silent when he talked with Detective Corey.

During the trial, Detective Corey related Haack's statements to the jury.

▪ Haack contends that the trial court's admission of his statements was error, arguing that the only evidence presented to indicate that he was given and knowingly waived his rights was Detective Corey's uncorroborated testimony, which he contends was insufficient to support the court's conclusion, in that Detective Corey could easily have corroborated the giving of the rights and the waiver by obtaining Haack's signature on the preprinted ac-

knowledgment of rights and waiver form that he had in his possession when he questioned Haack. In support of this contention, Haack cites *State v. Davis*, 73 Wn.2d 271, 438 P.2d 185 (1968) and *State v. Erho*, 77 Wn.2d 553, 463 P.2d 779 (1970),[3] two cases in which the defendants disputed that they had been advised of their rights and in which the State failed to call other officers who were present during the interrogations at issue in order to corroborate the testifying officers' testimony that they advised the defendants of their rights. In both cases the court held that where the defendant disputes the giving of the *Miranda* warnings and the State fails, without explanation, to call other officers who were present during the interrogation to corroborate that the warnings were given, the statement is inadmissible. This is because, under *Miranda*, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to . . . counsel." *Miranda*, 384 U.S. at 475. In *Davis*, the court said that, as a result of *Miranda*, "we must now require a greater quantum and quality of proof . . . when we apply the 'substantial evidence' test upon review of a trial court's findings as to the validity of an accused's waiver." *Davis*, 73 Wn.2d at 284.

We do not read *Davis* and *Erho* as requiring independent corroboration of the testimony of a police officer in every instance in which the defendant disputes the giving of the warnings and intelligent waiver of the right to remain silent. Rather, those cases stand for the proposition that where such independent evidence exists, it must either be presented or the State must explain on the record why the evidence is not being presented. The underlying rationale is akin to the "missing witness rule," that is, where a witness is under the control of the party present-

---

[3]This case is readily distinguishable from *Erho*, wherein the interrogating officer admitted that he failed to advise the defendant that his statements could be used against him and that he had the right to a court-appointed attorney if he could not afford one; here, there has been no claim that Detective Corey's *Miranda* warnings were defective in any way.

ing evidence and is not called and no explanation is given for that failure, the trier of fact may entertain an inference that the testimony of the missing witness would have been adverse. In the context of a suppression hearing based on *Miranda*, that inference is sufficient to tip the scales in favor of the accused, where the State offers no explanation of its failure to call the witness. In such instances, the State cannot meet its burden as a matter of law, unless there is sufficient other evidence to overcome the inference.

But the cases do not hold that before police interrogate a suspect at least two officers must be present so that one can corroborate the other in the event of a suppression hearing. Neither do the cases require police to obtain a written acknowledgment and written waiver of rights. As indicated by the Supreme Court in *State v. Myers*, where circumstances demonstrate that the evidence was sufficient to support the conclusion that a defendant knowingly waived his *Miranda* rights, the fact that a corroborating witness was not produced is not critical. *See Myers*, 86 Wn.2d 419, 428-29, 545 P.2d 538 (1976) (holding that signed waivers and police testimony describing the procedure used to obtain the waivers were sufficient to find a voluntary waiver of rights).

Here, the detective failed to ask Haack to sign the pre-printed acknowledgment and waiver form, although he did obtain Haack's signature on a medical release form. Whether Haack would have signed the form if asked is unknown. He may have done so, since he willingly signed the medical release form. Or he may not have done so, since he told the officer in no uncertain terms that he would answer those questions he wanted to answer and would not answer any questions that he did not want to answer. The officer's failure to ask Haack to sign the form goes to the weight to be given his testimony, but does not, as a matter of law, dictate that Haack's statements be suppressed. Were the rule otherwise, an accused could easily defeat admission of a statement merely by refusing

to sign an acknowledgment and waiver of rights form, although being fully advised, and although willingly and intelligently waiving.

The weight to be given to witnesses' conflicting testimony is inextricably tied to the trier of fact's credibility assessment. Here, the trial court found the detective to be a credible witness but that Haack was not credible, due to what appeared to be his "selective" memory, and due to Haack's demeanor during the hearing. Credibility determinations are for the trier of fact and are not subject to review by this court. *See State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

Haack also argues that the detective's testimony was "equivocal" in that the detective was not asked and did not testify whether Haack verbally waived his rights by an affirmative statement of waiver. Both *Miranda* and *Davis* emphasize that a waiver will not be presumed simply from silence after the warnings are given or even from the fact that a statement is eventually obtained. *Miranda*, 384 U.S. at 475; *Davis*, 73 Wn.2d at 286. But here, the warnings were prefaced by an affirmative statement from Haack that he would answer those questions he wished to answer and not those questions he did not wish to answer. Immediately after Haack so stated, the detective read the *Miranda* rights and asked Haack whether he understood them. Haack responded that he did. When the officer asked Haack whether he would cooperate with respect to charges against the person who stabbed him, Haack responded that he would think about doing so. Haack answered a number of questions about how he got stabbed. When he wished to stop answering questions, he so stated, thereby demonstrating that he fully understood his rights by his election to exercise them. The officer immediately ceased questioning Haack at that point, demonstrating his own adherence to the principles of *Miranda*.

■■ For a statement to be admissible under *Miranda*, the State must establish by a preponderance of the evidence that the defendant, after being fully advised of his

rights, knowingly and intelligently waived them. *State v. Braun*, 82 Wn.2d 157, 162, 509 P.2d 742 (1973). On the facts of this case, the trial court's determination that Haack, after being fully advised of his rights, knowingly and intelligently waived them is supportable on appeal, even though neither counsel at the suppression hearing asked Detective Corey whether Haack affirmatively stated that he would waive his rights. This is not a situation in which the advisement of rights was followed by silence. When asked whether he would cooperate, Haack responded that he would think about it. This statement was fully consistent with Haack's earlier statement that he would answer some questions but not others. Haack's own statements and conduct during the interrogation demonstrate a knowing and intelligent initial waiver followed by an election to exercise the right to remain silent, when he did not wish to answer any further questions. The trial court did not err by admitting Haack's statements into evidence at the trial.

3. *Did the trial court err by permitting the State to introduce hearsay testimony?*

Haack contends that the trial court improperly admitted hearsay testimony from the victim and another witness. The State first sought to introduce testimony from Cindy Tunicliff, Castro's girl friend, that on the night of the incident, while at a party at Haack's residence, she overheard a conversation between Haack and Castro in which Haack stated that he had been recently robbed of drugs by "Little John," an acquaintance of his and Castro's. The State argued that because Haack believed that Castro had set him up to be robbed by Little John, Tunicliff's testimony was relevant to prove Haack's motive to get revenge on Castro. Over defense objection, the trial court ruled that the statement was admissible as a statement of a party opponent probative of Haack's motive. Tunicliff was permitted to testify that she overheard Haack tell Castro that Little John had "robbed him for his drugs" at gunpoint.

Haack contends that Tunicliff's testimony did not indicate any motive and that he was prejudiced by the jury's finding out that he was involved with drugs. If Tunicliff's testimony stood alone, we likely would agree with Haack. However, the State demonstrated the relevance of the conversation Tunicliff overheard through an additional witness who testified later in the trial, Jolyn Proefrock. Proefrock testified that she overheard the same conversation between Haack and Castro, that Castro and Little John were friends, and that after several hours at the party and the consumption of a great deal of beer, everyone at the party got into vehicles and drove to the neighborhood where Little John lived. When he realized that he had been driven to Little John's neighborhood, Haack became enraged, believing that he was being set up for another run-in with Little John. His rage was directed at Castro and Proefrock. Haack approached Proefrock with a knife and said, "I'm going to fucking kill you, bitch, you're trying to set me up, I'm going to fucking kill him." The latter threat was directed at Ernie Castro. Ms. Proefrock heard Haack say, "Are you fucking-setting me up; I'll fucking-kill you; where the fuck's Ernie?" Haack then walked over and talked to Castro.

No objection was made to Proefrock's testimony. Because the relevance of Tunicliff's testimony is apparent in light of that of Proefrock, and because Tunicliff's challenged testimony is cumulative of the unchallenged testimony of Proefrock in any event, we find no error in the admission of Tunicliff's testimony describing the conversation she overheard. A rational trier of fact could reasonably infer from the testimony of Tunicliff and Proefrock, taken together, that Haack had a motive to attack Castro, in that Haack believed that Castro had set him up to be robbed by Little John.

Haack also challenges the trial court's decision to admit several of Ernie Castro's statements. Castro testified, without objection, that he felt "funny" about going to Haack's home early on the evening of the attack. When

asked why he felt funny about going to Haack's home, Castro said it was "[b]ecause somehow they got robbed on the streets for $30 in cash and some drugs, and . . . the people who robbed him —," at which point defense counsel objected. The court initially sustained the objection but ultimately admitted the testimony to show Castro's state of mind. Castro went on to testify that he heard that, during the robbery, Little John told Haack that he had heard from Castro that Haack had "what they were looking for." At that point the court reminded the jury that Castro's statement was only to be considered to the extent it affected his state of mind. Castro then testified that he heard that Haack and his brother thought that he had set them up. When asked why he went to Haack's house despite his funny feeling, Castro testified his friends had told him not to worry, that nothing would happen. The court again overruled the defense objection to hearsay.

Castro never identified who told him these things. Thus, Haack argues, his right of confrontation was violated in that he could not cross-examine the source or sources of the hearsay statements. In its responsive brief, the State concedes that Castro's state of mind was irrelevant and that the trial court erred in admitting his hearsay testimony. But since most of Ernie Castro's challenged testimony was cumulative of that of Proefrock, the State argues that the error was harmless beyond a reasonable doubt.

■ An appellate court is not bound by a party's erroneous concession of error on a question of law. *State v. Knighten*, 109 Wn.2d 896, 901-02, 748 P.2d 1118 (1988). Although we agree with the State that, if the trial court erred by admitting Castro's challenged testimony, the error was harmless beyond a reasonable doubt, in that the testimony was essentially cumulative of that of Proefrock which came in without objection, we conclude that the trial court did not err in admitting Castro's testimony.

■ In order to be admissible, evidence of the victim's state of mind must be relevant to a material issue of fact

before the jury. *State v. Cameron*, 100 Wn.2d 520, 531, 674 P.2d 650 (1983) (citing *State v. Parr*, 93 Wn.2d 95, 98-104, 606 P.2d 263 (1980) and *United States v. Brown*, 490 F.2d 758 (D.C. Cir. 1973)). In *Parr*, the victim was deceased; she was shot by the defendant during a quarrel. The defendant was charged with second degree murder. He testified at trial that the victim reached for the gun, and he, likewise, grabbed for it; in the ensuing struggle the gun was fired accidentally, killing the victim. In rebuttal, the prosecution presented evidence that some six months earlier, the victim told her brother that the defendant had threatened her with a gun, and that she was afraid of him. The court instructed the jury that this evidence was to be considered only as it bore on the state of mind of the victim, and that it was not to be taken as evidence of the truth of the facts about which the statement was made. On appeal, the defendant argued that the rebuttal testimony was hearsay, that the statements of the victim could not be tested by cross-examination, that the defendant was, accordingly, denied the right of confrontation, and that no limiting instruction could cure the prejudicial effect of the testimony. *Parr*, 93 Wn.2d at 97-98. The *Parr* court concluded that the trial court did not err in allowing the hearsay testimony that the victim was afraid of the defendant because that evidence was probative of the question of whether the victim reached for the gun during the quarrel, but the court excluded the hearsay evidence that the defendant had threatened the victim with the gun because that evidence was probative only of the defendant's intent and was neither sufficiently reliable nor corroborated by other evidence. *Parr*, 93 Wn.2d at 99-106.

In the course of its analysis, the *Parr* court said that it has long been established that an exception is made to the rule excluding hearsay when the state of mind or intention of a person is in question "if the court finds that two circumstances concur: (1) if there is some degree of necessity to use out-of-court uncross-examined declarations, and (2) if there is circumstantial probability of the trustworthiness of the out-of-court, uncross-examined declarations-

. . . . [I]f the circumstances do not import trustworthiness, such evidence may be inadmissible unless there is some other corroborating evidence." *Parr*, 93 Wn.2d at 98-99 (citation omitted). In the instant matter, Ernie Castro testified without objection that he felt "funny" going to Haack's residence. When asked why that was so, Ernie explained that he had heard that Haack thought Ernie had set him up to be robbed by Little John. What Ernie had heard was, of course, hearsay. That Ernie felt "funny" going to Haack's residence was not hearsay. Unlike the decedent in the *Parr* case, Ernie was present in court and subject to full cross-examination as to his own state of mind and subsequent conduct. By this point in the trial, the jury had already heard Proefrock testify, without objection, and was fully aware, based on Proefrock's description of Haack's statements and conduct, that Haack thought he had been set up by Castro to be robbed by Little John. That being so, any rational trier of fact would likely wonder why Ernie went to Haack's residence, especially after Ernie testified, without objection, that he felt "funny" in doing so. Ernie Castro's state of mind thus became relevant to explain his subsequent conduct: he went to Haack's residence in spite of having been told that Haack thought he had been set up by Castro, because his friends assured him nothing would happen.

The *Parr* court pointed out that in spite of substantial relevance, " 'the additional factual matters in the statement may simply be too explosive to be contained by the limiting instruction, in which case exclusion of the testimony is also necessitated.' " *Parr*, 93 Wn.2d at 100 (quoting *United States v. Brown*, 490 F.2d at 773-74). We do not believe that to be the case here. Although the trial court probably would, if the defense had requested it, have limited the evidence of the robbery by Little John to exclude any reference to drugs, no such request was made in this case in connection with the testimony of Tunicliff, Proefrock or Castro.

Moreover, to the extent that the jury may not have been

able to distinguish, in spite of the limiting instruction, between Ernie Castro's state of mind and the earlier evidence relating to the motive of Jason Haack, the jury had already heard, through Proefrock's testimony which came in without objection, that Haack had a motive to attack Castro, believing as he did that Castro had set him up for another run-in with Little John on the night of the party. *Contrast Parr*, 93 Wn.2d at 100-01 (quoting *Shepard v. United States*, 290 U.S. 96, 104, 54 S. Ct. 22, 78 L. Ed. 196 (1933) (Where a doctor was accused of murdering his wife by poison and the defense was suicide, it was error to allow a nurse to testify that the wife had said, two weeks before her death, "Dr. Shepard has poisoned me." To expect a jury to discriminate between the victim's state of mind in rebuttal of the suicide defense and the conduct attributed to the defendant in the statement was too subtle a distinction for the ordinary juror)). Thus, there was little reason for concern that the distinction the court asked the jury to make between Castro's state of mind and the truth of the content of the hearsay portions of Castro's testimony would be too subtle a notion for the jury to grasp.

In all of these circumstances, we conclude that the trial court did not err by allowing Ernie Castro to testify as to his own state of mind to explain his own conduct in attending the party at Haack's residence, in the hours preceding the knife attack.

Finding no error in the trial court's instructions, suppression ruling or evidentiary rulings, we affirm Haack's conviction of first degree burglary and first degree assault.

BAKER, C.J., and WEBSTER, J., concur.

Review denied at 134 Wn.2d 1016 (1998).