[No. 41970-0-II.   Division Two.   December 20, 2013.]

THE STATE OF WASHINGTON, *Respondent*, v. ODIES DELANDUS WALKER, *Appellant*.

*Jodi R. Backlund* and *Manek R. Mistry* (of *Backlund & Mistry*), for appellant.

*Mark E. Lindquist, Prosecuting Attorney*, and *Stephen D. Trinen, Deputy*, for respondent.

¶1   PENOYAR, J. — A jury convicted Odies Walker of first degree murder, first degree assault, first degree robbery, solicitation, and conspiracy for his role in the murder and robbery of an armored truck driver inside a Walmart. Walker appeals his convictions, arguing that the "to convict" premeditated murder instruction violated his due process

rights because it allowed the jury to convict him as an accomplice without proving that the principal committed all of the elements of the crime. Because accomplice liability law allows a jury to convict participants without unanimously determining which participants satisfied which elements of the crime, we hold that the jury instructions were not erroneous.

¶2 In the unpublished portion of the opinion, we address Walker's additional arguments that (1) the prosecutor committed numerous instances of misconduct and (2) his trial counsel was ineffective for failing to request a cautionary instruction on accomplice testimony and for failing to object to the prosecutor's misconduct. We also consider Walker's statement of additional grounds arguing that the trial court erred by denying his motion for a CrR 3.6 hearing. We hold that none of the alleged prosecutorial misconduct committed requires reversal, counsel was not ineffective, and the trial court correctly denied Walker's CrR 3.6 motion because the items to be suppressed were within the scope of a valid search warrant.[1] We affirm.

## FACTS

### I. BACKGROUND

¶3 In June 2009, Calvin Finley and Marshawn Turpin killed and robbed an armored truck driver inside the Lakewood Walmart. Finley shot and killed Kurt Husted, a Loomis armored truck driver who was picking up the store's daily earnings. The bullet went through Husted and struck a bystander, injuring the bystander's shoulder. Turpin grabbed the bag of money on Husted's cart, and he and Finley fled the store to a white Buick waiting in the parking lot. A witness later identified Walker, who is Finley's cousin,

---

[1] The State cross appeals, arguing that the trial court erred when it included language in the aggravating circumstances instruction that is applicable only in death penalty cases. Because we do not remand, we do not reach this issue on appeal.

as the driver of the Buick, and police recovered Walker's fingerprint on the driver's side seat belt.

¶4 Police were able to trace the Buick because a witness had memorized a partial license plate number. The Buick was registered to Sartara Williams, the mother of Finley's child. At Finley's request, Williams falsely reported the vehicle stolen in April and gave Finley the keys. The Buick was parked behind Walker's house under a tarp for a few months, until the robbery in June. After the robbery, the police found the Buick in an alley behind Finley's friend's house. Neighbors had seen Finley, Walker, and another man in the area that same afternoon. One of the men was carrying a bag behind his back.

¶5 About 30 minutes after the robbery, Walker returned to Walmart to pick up Turpin's car. He then went home, where his girlfriend, Tonie Williams-Irby, found him watching the news when she returned from work.

¶6 Walker and Williams-Irby picked their children up from school, then Walker drove to the alley where the Buick was parked, telling Williams-Irby that he needed to wipe fingerprints off the car. The Buick was surrounded by police when they arrived, so Walker kept driving.

¶7 Walker next drove his family to Al Trevino's house. On the way, Walker told Williams-Irby that he was in the Buick and on the phone with Finley during the robbery. When Finley asked the guard for the money, the guard laughed, so Walker told Finley to "kill the mother fucker." 8 Report of Proceedings (RP) at 729.

¶8 Finley and Turpin were at Trevino's when Walker and Walker's family arrived. Walker, Finley, and Turpin went into Trevino's bathroom and changed clothes. They put their clothes and a Loomis bag into a black plastic bag. Walker then put two $10,000 bundles of cash in Williams-Irby's purse and gave her $2,500 in cash to pay bills. Walker also threatened Trevino, telling him that it was "on [his] life and [his] family" if he said anything. 10 RP at 1143.

¶9 Trevino, Finley, and Turpin left Trevino's house together. Trevino drove them down near the river, where he saw Finley run in the direction of the river with the black plastic bag. Finley did not have the bag with him when he returned to the vehicle. Trevino then drove Finley to a motel.

¶10 Walker left Trevino's house with his family and drove to the Federal Way Walmart where he purchased two safes and a Nintendo Wii with cash. Walker gave one safe to Finley and put the other in the master bedroom closet at Walker's house. Walker put the $20,000 in cash into the closet safe. Williams-Irby put the cash Walker had given her for bills in an envelope that she placed in her dresser drawer. Walker then took his family out to dinner, where he paid with cash. While at dinner, he told Williams-Irby's son, "[T]his is how you do it. This is how you murder these niggers and get this money." 8 RP at 773.

¶11 On his way back from the restaurant, Walker was stopped by the police, who had received a tip that he was involved in the robbery and murder. The police arrested Walker and Williams-Irby. They obtained a search warrant for Walker's house. They found a safe in the master bedroom closet containing $20,000, an envelope containing $900 in the dresser, and ammunition for a 9 mm handgun—the same type of weapon used to shoot the guard—in the closet.

¶12 During questioning, Walker denied any involvement in the robbery. He admitted that he had seen the armored truck arrive at Walmart many times while he was waiting to pick up Williams-Irby, a manager at Walmart, from her shift. He also admitted that he had been at Walmart after the robbery to pick up Turpin's car.

¶13 The police arrested Finley the next day in Trevino's wife's car. The police searched the trunk of the car and discovered a safe containing $21,830 in cash.

II. TRIAL

¶14 The State charged Walker as an accomplice with (1) aggravated first degree premeditated murder, (2) first

degree felony murder further aggravated by a high degree of planning and a destructive and foreseeable impact on persons other than the victim, (3) first degree assault, (4) first degree robbery, (5) first degree solicitation to commit robbery, and (6) first degree conspiracy to commit robbery. The State also sought deadly weapon enhancements for the murder, assault, and robbery charges.

¶15 At trial, Williams-Irby, Darrell Parrott, Jessie Lewis, and Jordan Lopez all testified that they heard Walker planning to rob the armored truck at Walmart months before June 2009. Walker had attempted to recruit both Parrott and Lewis for the robbery. In May, Walker asked Parrott to be backup for Finley, telling Parrott that he would have to carry a gun. Parrott refused. Around the same time, Walker told Lewis about his plan. He told Lewis that Lewis's job would be to shoot the guard and that he, Walker, would be the getaway driver. Walker then drove Lewis and Finley to Walmart to show them how the plan would work. Walker knew the timing of the armored truck's arrival and how many guards went into the store each time. Walker offered both Finley and Lewis guns; Finley took a gun but Lewis refused. Finley and Lewis entered the store after the guard. Lewis left the store before the guard retrieved the money because he was nervous about the plan and "knew that someone was going to get killed." 9 RP at 912. Although Walker did not try to recruit her, Lopez twice overheard Walker discussing his plans to rob Walmart with Lewis and Finley.

¶16 Williams-Irby also overheard Walker discussing his plans to rob Walmart on numerous occasions. In February 2009, Walker started asking Williams-Irby, who sometimes attended Walmart staff meetings where the previous day's earnings were announced, how much money the armored truck picked up each day. Walker mentioned that he thought the armored truck would be "easy money." 7 RP at 656. In March, Williams-Irby heard Walker yelling at Finley and someone named Jonathan about the plan to rob Walmart.

Walker was angry that it was taking so long and was worried that Jonathan would make a mistake. He told the others that they would all go to jail if there was a mistake and that he would get the most time because he planned it. In April, she heard Walker discussing the robbery with Finley and Turpin. She heard Walker say that he would be the getaway driver because he was a better driver than the others and he would be recognized if he entered the store, where he used to work as a greeter. She also heard Walker and Finley discussing killing the armored truck guard. Walker told Finley to "do what you got to do" and then he offered Finley a 9 mm handgun. 7 RP at 665. On the morning of the robbery, Williams-Irby called Walker to report Walmart's earnings for the previous day.

¶17 Walker attempted to challenge Williams-Irby's credibility on cross-examination, pointing out that she had initially told the police that neither she nor Walker was involved in the robbery and that she had entered a plea deal with the State. Walker repeatedly asked Williams-Irby if she had told the State what it wanted to hear. Williams-Irby consistently replied that she knew the State wanted the truth. She also said, "My desire is to tell the truth and get closure for Mr. Husted's family." 8 RP at 822. Walker asked, "The truth is determined by [the prosecutor] isn't it?" 8 RP at 815. Williams-Irby replied that "[t]he truth is determined by what happened" and that she was "telling the truth whether [the prosecutor] want[s] to hear it or not." 8 RP at 815, 818.

¶18 The jury found Walker guilty as charged. The jury also found that the State had proved all of the alleged aggravating circumstances and that Walker or an accomplice was armed with a firearm during the murder, assault, and robbery. The trial court sentenced Walker to life plus 303 months.[2] Walker appeals his convictions. The State cross appeals, arguing that the trial court erred in its jury instructions.

---

[2] The trial court merged the two murder convictions for sentencing.

## ANALYSIS

### PREMEDITATION JURY INSTRUCTIONS

¶19 First, Walker argues that the trial court's premeditation instructions violated his due process rights because (1) they relieved the State of its burden of proving the charged crime and (2) they violated his right to a unanimous verdict. Specifically, he asserts that the trial court's premeditation instructions were erroneous because, under the first degree murder and accomplice liability statutes, the State had to prove that Finley, the shooter, had premeditated intent to kill the guard and, here, the instructions allowed the jury to find Walker guilty if it found either he *or* Finley had premeditated intent to kill the guard. We hold that the trial court's instructions properly stated accomplice liability law.

¶20 We review jury instructions de novo. *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006). Jury instructions are sufficient if, when read as a whole, they accurately state the law, are not misleading, and permit each party to argue its theory of the case. *State v. Clausing*, 147 Wn.2d 620, 626, 56 P.3d 550 (2002).

¶21 Under the first degree premeditated murder statute, the State must prove that the defendant, with premeditated intent, caused the death of another person. RCW 9A.32.030(1)(a). A person may be liable for the acts of another if he acts as an accomplice. RCW 9A.08.020. A person is an accomplice if, with knowledge that it will promote or facilitate the commission of a crime, he solicits, commands, encourages, or requests another person to commit the crime, or aids or agrees to aid another in planning or committing the crime. RCW 9A.08.020(3)(a).

¶22 The trial court gave the following instructions regarding premeditation: "A person commits the crime of premeditated murder in the first degree, as charged in Count I, when, with a premeditated intent to cause the

death of another person, he or an accomplice causes the death of another person." Clerk's Papers (CP) at 213.

> To convict the defendant of the crime of premeditated murder in the first degree, count I, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about 2nd day of June, 2009, the defendant or an accomplice acted with intent to cause the death of Kurt Husted;
>
> (2) That the intent to cause the death was premeditated . . . .

CP at 216. Neither party objected to these instructions at trial.

¶23 Division One of this court has upheld similar jury instructions involving accomplice liability. In *State v. Haack*, the State charged the defendant with first degree assault after he and his brother both attacked the victim. 88 Wn. App. 423, 429-30, 958 P.2d 1001 (1997). The trial court instructed the jury that to convict the defendant, it must find that " 'the defendant or an accomplice assaulted [the victim]' " and that " 'the defendant or an accomplice acted with intent to inflict great bodily harm.' " *Haack*, 88 Wn. App. at 427 (emphasis omitted). The defendant argued that this instruction allowed the jury to convict by splitting the elements of the crime between himself and his brother. *Haack*, 88 Wn. App. at 427. Division One agreed but held that the instructions were not an incorrect statement of accomplice liability law. *Haack*, 88 Wn. App. at 427. The court stated that the jury could convict all of the participants in a first degree assault if the State proved that a life-threatening injury was caused by one of the participants and that at least one of the participants intended to inflict life-threatening harm; the State did not have to prove which participant actually inflicted the injury. *Haack*, 88 Wn. App. at 428; *see also State v. Hoffman*, 116 Wn.2d 51, 84-85, 104, 804 P.2d 577 (1991) (affirming defendants' first degree murder convictions even though

instructions allowed the jury to convict if they found either defendant had premeditated the shooting; the jury did not have to unanimously agree which defendant was the accomplice or principal).

¶24 Walker attempts to distinguish *Haack*, but his argument is not persuasive. He argues that in *Haack*, there was evidence that the principal both had the necessary intent and actually committed the assault, whereas here, the evidence proved that Finley was the shooter and Walker had premeditated intent. This distinction is inapposite for two reasons. First, there is evidence from which the jury could find that Finley also had premeditated intent. Several witnesses testified that they overheard Walker and Finley discussing the robbery, including the fact that someone would shoot the guard. Williams-Irby heard Walker tell Finley "do what you got to do" in regard to killing the guard. 7 RP at 665. Walker provided Finley with a loaded gun that Finley carried into Walmart both the time that he entered with Lewis and did not attempt the robbery and the day of the murder. *See State v. Ra*, 144 Wn. App. 688, 703, 175 P.3d 609 (2008) (listing the planned presence of a weapon at the scene of the crime as one circumstance supporting premeditation).

¶25 Second, even if the jury did "split the elements of the crime" between Finley and Walker, this was not an error under accomplice liability law. Appellant's Br. at 48. The jury needs only to conclude unanimously that both the principal and the accomplice participated in the crime; it does not need to unanimously conclude as to the manner of their participation. *Hoffman*, 116 Wn.2d at 104. Therefore, as the *Haack* court stated, the jury could convict all participants of a crime, even the lookout, as long as the State proved that at least one participant committed the criminal act and one participant—not necessarily the same one—possessed the required intent. 88 Wn. App. at 429. Nor does it matter that the evidence clearly showed that Finley, not Walker, performed the actual shooting.

The legislature has said that anyone who participates in the commission of a crime is guilty of the crime and should be charged as a principal, regardless of the degree or nature of his participation. Whether he holds the gun, holds the victim, keeps a lookout, stands by ready to help the assailant, or aids in some other way, he is a participant. The elements of the crime remain the same.

*State v. Carothers*, 84 Wn.2d 256, 264, 525 P.2d 731 (1974), *overruled on other grounds by State v. Harris*, 102 Wn.2d 148, 685 P.2d 584 (1984).

¶26 The trial court's instructions were correct statements of accomplice liability law and did not deny Walker his due process. There was no need for a unanimity instruction where accomplice liability allows a jury to convict as long as it finds that the elements of the crime were met, regardless of which participant fulfilled them.

¶27 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, A.C.J., and BJORGEN, J., concur.

Review granted at 180 Wn.2d 1002 (2014).