# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71112-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LARRY PAUL WILLIAMS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: December 21, 2015 |
| | ) | |

VERELLEN, A.C.J. — An accomplice to manslaughter is legally responsible for the principal's acts that proximately caused the victim's death. When the accomplice acknowledges that the principal's acts caused the victim's death, the accomplice has no viable theory that the accomplice was not a proximate cause of the death, or that the principal was a superseding cause. The same is true even if the accomplice might also have been found guilty as a co-principal.

Larry Williams appeals his manslaughter conviction. He asserts his wife Carri Williams caused the death of their adopted daughter H.W. from hypothermia after the young girl spent approximately nine hours outside with inadequate clothing in rainy, cold weather.[1] But Larry and Carri both engaged in a regimen of punishment that deprived H.W. of food, required her to eat meals outside in all kinds of weather, and placed her at

---

[1] For ease of reference, we refer to Larry Williams and his wife Carri Williams by their first names.

a severe risk of hypothermia. He promoted and participated in Carri's reckless acts that he contends resulted in H.W.'s death from hypothermia. We conclude sufficient evidence supports Larry's conviction as an accomplice to manslaughter.

If guilty as an accomplice under these facts, Larry has no viable theory that he was not a proximate cause of H.W.'s death, or that Carri's conduct was a superseding cause. The same is true even if Larry might also have been found guilty as a co-principal.

Therefore, we conclude Larry does not establish prejudice to support his claim that his attorney was ineffective for failing to request a proximate cause instruction on the manslaughter charge. Neither was he prejudiced by the trial court's refusal to give his proposed superseding cause instruction.

Finally, the plain language of the special verdict form adequately tied Larry's own conduct to the aggravating factors relied on to impose an exceptional sentence.

We affirm Larry's convictions and exceptional sentence.

### FACTS

Larry and Carri married in 1990. They have seven biological children. In August 2008, they adopted two children from Ethiopia, H.W. and I.W., who is deaf.

Larry worked a swing shift at his job, leaving home at noon and returning around midnight. Larry cooked the children breakfast every morning before work. He was frequently home on weekends. Carri, fluent in sign language, raised and home schooled the children and made them do chores around the house. She also made the children do "boot camp," a form of punishment consisting of extra chores both inside and outside the house.[2]

---

[2] Report of Proceedings (RP) (Aug. 5, 2013) at 55.

When H.W. first arrived at the Williamses' home, she behaved and integrated well. After the first year, she occasionally disobeyed the Williamses, such as taking food without permission. As a result, H.W. was not allowed to participate in some holiday activities and family events.

Larry acknowledges that the punishment directed at H.W. and I.W. "eventually got way out of hand."[3] Both Carri and Larry disciplined their children. The Williamses punished I.W. and H.W. more than the other children, and their punishments increased in "severity" and "frequency" over time.[4] Punishments included spankings with a belt, a wooden stick or a glue stick, and being hosed down with cold water outside.

The Williamses used food deprivation as punishment. They served cold food and leftovers, frozen vegetables, and sandwiches soaked in water to I.W. and H.W., but not to the other children. They forced H.W. and I.W. to eat some of their meals outside in "any kind of weather."[5] During the last six months of her life, H.W. ate breakfast and other meals outside "more times than not."[6] H.W. and I.W. were denied the most meals out of all the children. Larry knew H.W. was denied meals for her "oppositional behavior at the meal table."[7] When H.W. was placed outside, she would not come back inside sometimes "even though she was allowed back inside."[8] She would stay outside "for

---

[3] Appellant's Br. at 8.

[4] RP (Aug. 27, 2013) at 32.

[5] RP (Aug. 1, 2013) at 26.

[6] RP (Aug. 27, 2013) at 103.

[7] RP (Aug. 28, 2013) at 155.

[8] RP (Aug. 27, 2013) at 135.

3

long periods of time."[9] The Williamses sometimes "didn't let her into the house to warm up."[10] Larry knew H.W. "was sent outside as punishment."[11]

The Williamses used isolation as punishment. At times, the Williamses forced H.W. to stay and to sleep alone in the barn outside without electricity and to take cold showers outside. Other times, the Williamses forced H.W. to stay and to sleep alone in a shower room. Beginning in late 2010, and up until her death, the Williamses forced H.W. to stay in and to sleep alone in a closet at "night and during the day sometimes."[12] The closet measured "two foot by four foot three inches."[13] H.W. "wasn't able to stretch" or to "change her position significantly" inside it.[14] None of the other children were forced to sleep in the closet. The closet door was locked from the outside, and Larry "installed the lock in the closet."[15] Larry knew that for the last six months of her life, the closet served as H.W.'s bedroom.

In Ethiopia, H.W. had "a healthy size and stature" for her age.[16] "There was no evidence of malnutrition."[17] When she first arrived at the Williamses' home, H.W. "had fairly normal height and weight."[18] During the first two years, H.W.'s weight increased

---

[9] RP (Aug. 20, 2013) at 50.
[10] RP (Aug. 1, 2013) at 20.
[11] RP (Aug. 27, 2013) at 132.
[12] RP (Aug. 5, 2013) at 49.
[13] RP (Aug. 7, 2013) at 127.
[14] RP (Aug. 2, 2013) at 28.
[15] RP (Aug. 28, 2013) at 147.
[16] RP (Aug. 13, 2013) at 87.
[17] Id. at 98.
[18] RP (July 29, 2013) at 70.

steadily and overall "she was generally healthy."[19] Her body weight was in the "90th percentile" of the body mass index chart (BMI), which is considered "overweight."[20] H.W. was described as "quite chubby."[21] By 2011, H.W.'s weight dropped from 110 pounds to around 80 pounds. Larry acknowledged that he "noticed" H.W.'s "weight loss."[22] When H.W. died, her weight was in the "third percentile" of the BMI.[23]

Several experts testified that H.W.'s malnutrition put her at a severe risk of hypothermia. Dr. Frances Chalmers testified that extreme weight loss made a person "more susceptible to hypothermia."[24] Dr. Rebecca Weister testified that H.W.'s starvation and extreme malnutrition put her at a "high risk" of hypothermia.[25] Dr. Daniel Selove testified that H.W.'s "thinness made her [at] increased risk to die of hypothermia"[26] and that the principal cause of H.W.'s death was "hypothermia."[27] He noted that the "prolonged exposure to rain and wintery weather with inadequate clothing and chronic malnutrition were significant contributing factors" in H.W.'s death.[28]

On May 11, 2011, Larry left for work as usual around noon. Carri sent H.W. outside around 3:00 p.m. Initially, H.W. wore sweatpants and a long-sleeve shirt. The

---

[19] Id.

[20] Id. at 130.

[21] RP (Aug. 2, 2013) at 126.

[22] RP (Aug. 28, 2013) at 41.

[23] RP (July 29, 2013) at 75.

[24] Id. at 82.

[25] RP (Aug. 26, 2013) at 41.

[26] RP (July 30, 2013) at 57.

[27] Id. at 21, 81.

[28] RP (Aug. 26, 2013) at 46.

temperature was "in the mid- to upper fifties."[29] A few hours later, H.W. ate dinner outside.

It started to rain later that evening, and the temperature became "cold."[30] Carri told H.W. to do exercises to keep warm. Carri told H.W. multiple times to come inside during the evening, but she refused. Carri also told one of her daughters to check on H.W. every 10 or 15 minutes. Carri placed dry clothes outside for H.W. because the rain had soaked her clothes.

Around 8:30 p.m., Carri told H.W. to go to the port-a-potty. H.W. "took about ten or twenty steps, and she began throwing herself down" on her hands and knees.[31] H.W. repeated this behavior all the way to the port-a-potty. H.W. did the same thing on the way back to the house, hitting her forehead on the concrete patio several times. H.W. continued to "throw herself around" for "twenty or thirty minutes."[32] H.W. "had skinned up her knees and her elbows quite a bit" and "had a knot on her forehead."[33] Each time that one of Carri's daughters looked outside to check on H.W., she had removed pieces of clothing until she was naked.[34]

Shortly before midnight, one of Carri's daughters saw H.W. lying naked, face down in the grass. Carri went to check on H.W. She tried to carry H.W. inside, but failed. Carri grabbed a sheet to cover H.W.'s naked body. Carri's sons helped carry

---

[29] RP (Aug. 30, 2013) at 92.

[30] RP (Aug. 6, 2013) at 96.

[31] RP (Aug. 28, 2013) at 166.

[32] Id. at 167.

[33] Id. at 168.

[34] The false sensation of warmth and removal of clothing, called "paradoxical undressing," is common to hypothermia. RP (July 30, 2013) at 81.

H.W. inside. Carri did not feel a pulse. She performed cardiopulmonary resuscitation (CPR), called Larry, and then called 911. Larry arrived and helped perform CPR until medics arrived. H.W. died at the hospital at 1:30 a.m.

A jury convicted Larry of first degree manslaughter and first degree assault of a child. The trial court imposed an exceptional sentence based on several aggravating factors.

Larry appeals.

## ANALYSIS

### Sufficiency of the Evidence

Larry contends insufficient evidence supports his manslaughter conviction as an accomplice. We disagree.

Evidence is sufficient to support a conviction if any rational trier of fact could have found the crime's essential elements beyond a reasonable doubt.[35] We view the evidence and all reasonable inferences in the light most favorable to the State.[36]

A person commits first degree manslaughter in the first degree when he or she either "recklessly causes" or was an accomplice to another who recklessly causes "the death of another person."[37] A person is "reckless" or "acts recklessly" "when he or she knows of and disregards a substantial risk that a [death] may occur and his or her

---

[35] State v. Condon, 182 Wn.2d 307, 314, 343 P.3d 357 (2015) (quoting State v. Luvene, 127 Wn.2d 690, 712, 903 P.2d 960 (1995)).

[36] State v. Ozuna, 184 Wn.2d 238, 359 P.3d 739, 744 (2015).

[37] RCW 9A.32.060(1)(a).

disregard of such substantial risk is a gross deviation from conduct that a reasonable person would exercise in the same situation."[38]

The trial court instructed the jury on accomplice liability:

> A person is guilty of a crime if it is committed by the conduct of another person for whom he or she is legally accountable. A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of the crime.
>
> A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either: (1) solicits, commands, encourages, or requests another person to commit the crime; or (2) aids or agrees to aid another person in planning or committing the crime.
>
> The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.
>
> A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.[39]

"An accomplice must have actual knowledge that the principal was engaged in the charged crime."[40] But an accomplice "need not have specific knowledge of every element of the crime,"[41] nor "share the same mental state as the principal";[42] "general knowledge of 'the crime' is sufficient."[43] The accomplice need only have "encouraged,

---

[38] RCW 9A.08.010(1)(c).

[39] Clerk's Papers (CP) at 328.

[40] State v. Clark, 2015 WL 6447738, at *14 (Wash. Ct. App. Oct. 26, 2015).

[41] State v. Roberts, 142 Wn.2d 471, 512, 14 P.3d 713 (2000).

[42] State v. Berube, 150 Wn.2d 498, 511, 79 P.3d 1144 (2003).

[43] State v. McChristian, 158 Wn. App. 392, 400, 241 P.3d 468 (2010).

rendered assistance, or aided in the planning or commission of the crime."[44] A person "may become an accomplice without actually rendering physical aid to the endeavor."[45] An accomplice need not be present at the commission of the crime and is "equally culpable as the principal," regardless of who "actually performed the harmful act."[46] At a minimum, there must be proof that the accomplice "did something in association with the principal to accomplish the crime."[47]

Accomplice liability is "derivative."[48] Criminal liability is the same whether one acts as a principal or an accomplice.[49] Accomplice liability is not an element or alternative means of committing a crime but is an alternative theory of liability.[50] The jury is "not required to determine which participant acted as a principal and which acted as an accomplice" in the crime.[51] Nor is the jury required to unanimously agree on the

---

[44] State v. McDonald, 90 Wn. App. 604, 611, 953 P.2d 470 (1998), aff'd, 138 Wn.2d 680, 981 P.2d 443 (1999); see also RCW 9A.08.020(3)(a)(ii).

[45] WAYNE R. LaFAVE, SUBSTANTIVE CRIMINAL LAW § 13.2(a), at 338 (2d ed. 2003) (citing RCW 9A.08.020).

[46] McDonald, 90 Wn. App. at 611.

[47] State v. Boast, 87 Wn.2d 447, 455-56, 553 P.2d 1322 (1976).

[48] State v. Davis, 35 Wn. App. 506, 510, 667 P.2d 1117 (1983) (to establish an accomplice's derivative liability for first degree robbery, the State need not prove beyond a reasonable doubt that the accomplice knew his co-participant was armed).

[49] State v. Silva-Baltazar, 125 Wn.2d 472, 480-81, 886 P.2d 138 (1994).

[50] State v. Teal, 152 Wn.2d 333, 338, 96 P.3d 974 (2004).

[51] State v. Haack, 88 Wn. App. 423, 428, 958 P.2d 1001 (1997); see also State v. Teal, 152 Wn.2d 333, 339, 96 P.3d 974 (2004) (stating that a jury need not determine whether a defendant acted as a principal or an accomplice in a crime if it is convinced that the defendant participated in the crime); State v. Baylor, 17 Wn. App. 616, 618, 565 P.2d 99 (1977) ("[W]hen it cannot be determined which of two defendants actually committed a crime, and which one encouraged or counseled, it is not necessary to establish the role of each. It is sufficient if there is a showing that each defendant was involved in the commission of the crime.").

theory underlying the conviction.[52]

Larry asserts "the evidence at trial fell well short of establishing [his] guilt as an accomplice to [m]anslaughter."[53] We conclude a rational trier of fact could have found that Larry was Carri's accomplice regardless of whether he was present when H.W. developed hypothermia.

Larry participated in conduct that promoted and encouraged Carri's reckless acts that resulted in H.W.'s death. Larry participated in and promoted a regimen of punishment that decreased H.W.'s body weight to the third percentile of the BMI and placed H.W. at a severe risk of hypothermia. Larry participated in and knew about the corporal punishment, including spankings with a belt and a glue stick and forcing H.W. to stay in and to sleep in a small, locked closet.

Larry cooked breakfast for H.W. during the weekdays, and he was generally at home on weekends. Larry knew H.W. was often forced to eat breakfast and other meals outside, H.W. was fed cold and frozen food and sandwiches soaked in water, and H.W. was denied meals for her "oppositional behavior at the meal table."[54] Larry knew H.W. spent significant amounts of time outside in all kinds of weather, H.W. often remained outside after eating, H.W. was sent outside as punishment, and that she sometimes refused to return inside upon request. Larry knew H.W. was forced to use the port-a-potty outside and to take cold showers outside since he built the shower. Larry knew H.W. was forced to occasionally stay in and to sleep in the barn outside

---

[52] See State v. Carothers, 84 Wn.2d 256, 261, 525 P.2d 731 (1974), overruled on other grounds by State v. Harris, 102 Wn.2d 148, 685 P.2d 584 (1984).

[53] Appellant's Br. at 22; see also id. at 37 ("[H]e was tried and convicted as an accomplice to Carri.").

[54] RP (Aug. 28, 2013) at 155.

without electricity and was forced to stay in and to sleep in a locked shower room. Larry installed the lock on the closet. He knew H.W. was forced often to stay in and to sleep in a small locked closet, which served as her bedroom for the last six months of her life.

Contrary to Larry's argument, the "[o]n or about May 12, 2011" charging period for the manslaughter charge does not limit the charge only to events when Larry was not home on May 11 and 12, 2011.[55] Accomplice liability extends to all acts leading up to the charged crime. "[W]here time is not a material element of the charged crime, the language 'on or about' is sufficient to admit proof of the act at any time within the statute of limitations, so long as there is no defense of alibi."[56] Time is not a material element of first degree manslaughter.[57] The conduct here also falls well within the statute of limitations period, and Larry did not rely on a true alibi defense. The jury was not limited in determining Larry's guilt to the events that occurred while he was not home on May 11 and 12, 2011.

Larry also argues that any role he had in H.W.'s malnourishment "misses the mark" because the State's expert indicated that malnourishment was only a possible contributing factor in her death.[58] But ample expert testimony supports that H.W.'s extreme weight loss put her at a severe risk of hypothermia.

Because Larry participated in the punishment that placed H.W. at severe risk of hypothermia, and he promoted and encouraged Carri's reckless acts that resulted in

---

[55] CP at 11.

[56] State v. Hayes, 81 Wn. App. 425, 432, 914 P.2d 788 (1996).

[57] See RCW 9A.32.060.

[58] Appellant's Br. at 25.

H.W.'s death, we conclude sufficient evidence supports Larry's manslaughter conviction as an accomplice.

*Ineffective Assistance*

Larry contends his counsel was ineffective when he failed to request a proximate cause instruction for the manslaughter charge. We disagree.

We review ineffective assistance claims de novo.[59] For an ineffective assistance claim, a defendant must show deficient performance and resulting prejudice.[60] Counsel's performance is deficient if it falls "below an objective standard of reasonableness."[61] We strongly presume that counsel's performance was reasonable and effective.[62] To establish prejudice, the defendant must show there is a reasonable probability that, but for the deficient performance, the outcome would have been different.[63] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[64] The defendant's burden to show prejudice is "based on the record developed in the trial court" and not on hypothetical theories that could have been advanced at trial.[65]

---

[59] State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

[60] Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Nichols, 161 Wn.2d 1, 8, 162 P .3d 1122 (2007).

[61] State v. Townsend, 142 Wn.2d 838, 843-44, 15 P.3d 145 (2001).

[62] Strickland, 466 U.S. at 689; State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

[63] Nichols, 161 Wn.2d at 8.

[64] Strickland, 466 U.S. at 694; see also State v. Jones, 183 Wn.2d 327, 339, 352 P.3d 776 (2015) ("'reasonable probability'" means "by less than a more likely than not standard").

[65] McFarland, 127 Wn.2d at 337.

Larry asserts the failure to instruct on proximate cause for the manslaughter charge precluded him from arguing that his conduct did not proximately cause the hypothermia and resulting death. But this overlooks the fact that the State did not need to prove that Larry's acts proximately caused H.W.'s death; it only needed to prove that Larry "aided" Carri in the commission of the crime.[66]

An accomplice "is considered to have actually committed the crime" and is "subject to all the legal consequences of [the] crime" because the accomplice's liability "'is the same as that of the principal.'"[67] Accomplice liability is derivative, based on the principal's conduct whose acts proximately caused the unlawful result.[68] Therefore, an accomplice to manslaughter is legally responsible for the principal's acts that proximately caused the victim's death. So long as the principal's acts proximately caused the death, an accomplice may not argue that his own acts did not proximately cause the death. Our Supreme Court in State v. McDonald rejected a similar argument that an accomplice's act must be the proximate cause of the principal's act which, in turn, must be the proximate cause of the death.[69]

Larry acknowledges that Carri's acts proximately caused H.W.'s hypothermia and resulting death. Consistent with the record developed below, his theory at trial and on appeal is not that H.W.'s own conduct or someone other than Carri proximately caused H.W.'s death. If he was convicted as an accomplice to Carri's acts, he has no viable

---

[66] Strickland, 466 U.S. at 690.

[67] State v. Carter, 154 Wn.2d 71, 78, 109 P.3d 823 (2005) (quoting State v. Graham, 68 Wn. App. 878, 881, 846 P.2d 578 (1993)).

[68] Davis, 35 Wn. App. at 510-11.

[69] 138 Wn.2d 680, 689-90, 981 P.2d 443 (1999).

theory that he was not a proximate cause of the death.

At oral argument, Larry suggested that he was entitled to a proximate cause instruction because he may have been found guilty of manslaughter as a principal. Generally, a principal charged with manslaughter would be entitled to a proximate cause instruction to argue that his conduct did not proximately cause the death.[70] But there is no reasonable probability that Larry was found guilty as the sole principal. The facts that could support Larry's guilt for manslaughter as a principal also reasonably establish Carri's guilt as a co-principal. In turn, those same facts would necessarily support Larry's guilt as an accomplice. Stated differently, there is no reasonable probability that Larry could be guilty as a principal without also being an accomplice to Carri's acts as a co-principal. Even if Larry is guilty as both an accomplice and a co-principal, he remains legally responsible for the consequences of Carri's acts. There is no reasonable probability that his counsel's failure to request a proximate cause instruction for the manslaughter charge changed the outcome. Therefore, Larry's ineffective assistance claim fails.

*Superseding Cause Instruction*

Larry challenges the trial court's denial of his proposed superseding cause instruction. He contends he was entitled to such an instruction to argue that Carri's conduct was a superseding cause. We disagree.

---

[70] See State v. Christman, 160 Wn. App. 741, 754, 249 P.3d 680 (2011) ("resulting in the death" language in elements instruction for controlled substances homicide charge requires proof of proximate cause).

We review a trial court's refusal to give a proposed instruction for abuse of discretion.[71] Jury instructions are adequate if, taken as a whole, they permit the defendant to argue his or her theory of the case, do not mislead the jury, and properly inform the jury of the applicable law.[72]

Larry's proposed superseding cause instruction states:

> If you are satisfied beyond a reasonable doubt that the acts of the defendant were a proximate cause of the death, it is not a defense that conduct of the deceased *or another* may also have been a proximate cause of the death. However, if a proximate cause of the death was a new independent intervening act of the deceased *or another* which the defendant, in the exercise of ordinary care, should not reasonably have anticipated as likely to happen, the defendant's acts are superseded by the intervening cause and are not a proximate cause of the death. An intervening cause is an action that actively operates to produce harm to another after the defendant's acts have been committed.[73]

This proposed instruction omits any reference to an accomplice's acts and allows the jury to find that the defendant's acts may be superseded by an intervening act "of the deceased or another."

The trial court adopted with minor variations the State's proposed superseding cause instruction. That instruction mirrors the pattern instruction on superseding cause, but deleted the bracketed phrase "or another."[74] Instruction 12 states:

---

[71] State v. Walker, 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998).

[72] State v. Barnes, 153 Wn.2d 378, 382, 103 P.3d 1219 (2005).

[73] CP at 231 (emphasis added).

[74] Compare CP at 285, with CP Supp. at 99. Defense counsel did object. The pattern jury instruction states, "If you are satisfied beyond a reasonable doubt that the [acts] [or] [omissions] of the defendant were a proximate cause of the death, it is not a defense that the conduct of *[the deceased]* *[or]* *[another]* may also have been a proximate cause of the death. [However, if a proximate cause of the death was a new independent intervening act of *[the deceased]* *[or]* *[another]* which the defendant, in the exercise of ordinary care, should not reasonably have anticipated as likely to happen, the defendant's acts are superseded by the intervening cause and are not a proximate cause

If you are satisfied beyond a reasonable doubt that the acts or omissions of the defendant *or his accomplice* were a proximate cause of the death, it is not a defense that the conduct *of the deceased* may also have been a proximate cause of the death.

However, if a proximate cause of the death was a new independent intervening act of the deceased which the defendant, *or his accomplice*, in the exercise of ordinary care, should not reasonably have anticipated as likely to happen, the defendant's, *or his accomplice's*, acts are superceded by the intervening cause and are not a proximate cause of the death. An intervening cause is an action that actively operates to produce harm to another after the defendant's, or his accomplice's acts or omissions have been committed.

However, if in the exercise of ordinary care, the defendant *or his accomplice* should reasonably have anticipated the intervening cause, that cause does not supercede defendant's *or his accomplice's* original acts and defendant's *or his accomplice's acts* are a proximate cause. It is not necessary that the sequence of events or the particular injury be foreseeable. It is only necessary that the death fall within the general field of danger which the defendant *or his accomplice* should have reasonably anticipated.[75]

Instruction 12 precluded the jury from finding that acts by someone other than the deceased could constitute a superseding cause.

Larry claims that by failing to use the phrase "of another" after all references to "the deceased" and by including the phrase "or his accomplice" after all references to "the defendant," the jury was precluded from finding that Carri's conduct was a superseding cause. But he does not have a viable legal theory that Carri was a superseding cause of the death.

---

of the death. An intervening cause is an action that actively operates to produce harm to another after the defendant's [acts] [or] [omissions] have been committed [or begun]." 11 WASHINGTON PRACTICE: PATTERN JURY INSTRUCTIONS: CRIMINAL WPIC 25.03 (3d ed. 2014) (emphasis added).

[75] CP at 285 (emphasis added).

Either Larry is, or is not, an accomplice to Carri's acts. Larry did not advance any theory below under which Carri is not legally responsible as a principal. As discussed earlier, if Larry was guilty as an accomplice to Carri's acts, then he is "equally culpable" for the consequences of those acts, and he has no viable theory that Carri's acts are a superseding cause of the death.[76] And if Larry was guilty as a co-principal, then he is also necessarily guilty as an accomplice to Carri's acts. On this record, Carri's acts as co-principal could never be a superseding cause of H.W.'s hypothermia and resulting death.

Because Larry did not have a viable theory that Carri's conduct was a superseding cause, we conclude he was not prejudiced by the trial court's refusal to give his proposed superseding cause instruction.

*Exceptional Sentence*

Larry contends the exceptional sentence for his manslaughter conviction must be vacated because it may have been based on principles of accomplice liability. We disagree.

In State v. Hayes, our Supreme Court determined that "a sentencing judge can impose an exceptional sentence on an accomplice only where the accomplice's own conduct informs the aggravating factor."[77] Because the Hayes court could not determine if the jury found that the defendant had any knowledge that informed the aggravating factors, the court vacated the defendant's exceptional sentence.[78] More

---

[76] McDonald, 90 Wn. App. at 611.

[77] 182 Wn.2d 556, 563-64, 342 P.3d 1144 (2015).

[78] Id. at 567. Specifically, in Hayes, to conclude that the major economic offense aggravating factor applied to Hayes's identity theft charge, the jury had to find "at least one of two factors beyond a reasonable doubt: (1) the crime involved multiple victims or

17

recently, in State v. Weller, the Wellers were convicted of multiple offenses. For those offenses, a jury answered "yes" to the question, "Did *the defendant's conduct* during the commission of the crime manifest deliberate cruelty to the victim?"[79] The Weller court concluded the exceptional sentence was justified because the jury expressly found that each of the Wellers' own conduct, and not the Wellers' joint conduct, supported the exceptional sentence.[80]

The trial court here found several aggravating factors to justify the exceptional sentence: deliberate cruelty to the victim, victim vulnerability, abuse of trust, and destructive and foreseeable impact on persons other than the victim.[81] The statute on which Larry's exceptional sentence was based, RCW 9.94A.535(3), does not contain triggering language "that would extend its application to a conviction based on accomplice liability."[82] Nothing in RCW 9.94A.535(3) explicitly extends responsibility to an accomplice.[83] Therefore, the aggravating factors found by the jury here must be based on Larry's own misconduct or knowledge.

Consistent with Weller and Hayes, the jury could not have found the aggravating factors for one of the Williamses based on the conduct of the other. For Larry's

---

multiple incidents per victim or (2) the crime involved a high degree of sophistication or planning or occurred over a lengthy period of time." Id. at 559 (citing RCW 9.94A.535(3)(d)(i), (iii)).

[79] 185 Wn. App. 913, 921, 344 P.3d 695 (2015), review denied, 183 Wn.2d 1010 (2015) (emphasis added).

[80] Id. at 928.

[81] See RCW 9.94A.535(3).

[82] State v. Hayes, 177 Wn. App. 801, 808, 312 P.3d 784 (2013), aff'd, 182 Wn.2d 556, 342 P.3d 1144 (2015).

[83] Id. at 809.

manslaughter conviction, the jury answered "yes" to these questions in the special verdict:

(1) Were *Larry Williams* and [H.W.] members of the same family or household?

(2) Did *Larry Williams's conduct* during the commission of the crime manifest deliberate cruelty to the victim?

(3) Did *Larry Williams know, or should he have known*, that the victim was particularly vulnerable or incapable of resistance?

(4) *As to the defendant Larry Williams*, was this offense an aggravated domestic violence offense?

(5) Did *Larry Williams* use his position of trust to facilitate the commission of the crime?

(6) *As to the defendant Larry Williams*, did the crime involve a destructive and foreseeable impact on persons other than the victim?[84]

Each question in the special verdict focused on Larry's "own misconduct" or his own knowledge.[85] Larry disputes Weller's holding, arguing that "merely asking about the 'defendant's conduct' . . . does not preclude jurors from assessing that conduct with notions of accomplice liability."[86] But we agree with Weller and disagree with any contention that the references to Larry's conduct in the special verdict form allowed the jury to apply principles of accomplice liability in finding the aggravating factors. The plain language of the special verdict form ties Larry's own conduct directly to the aggravating factors.

---

[84] CP at 319-20 (emphasis added).

[85] Hayes, 182 Wn.2d at 563.

[86] Reply Br. at 14.

19

Therefore, we conclude the exceptional sentence imposed on Larry's manslaughter conviction was based on his own conduct or his knowledge of the principal's conduct that informed the aggravating factors.[87]

## CONCLUSION

We affirm Larry's convictions for first degree manslaughter and first degree assault of a child and his exceptional sentence.

WE CONCUR:

Trickey, J

---

[87] Larry concedes the Supreme Court's recent decision in State v. Love, 183 Wn.2d 598, 354 P.3d 841 (2015), controls and settles the public trial issues raised in his opening brief.