IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 36967-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ALVARO GUAJARDO, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Alvaro Guajardo appeals his conviction and sentence

for first degree felony murder. We affirm his conviction but remand for resentencing and

for the trial court to vacate the jury's guilty verdict for first degree kidnapping. The trial

court is directed to resentence Guajardo by excluding a California conviction it previously

included and by excluding two prior Washington convictions for possession of a

controlled substance, the latter in accordance with *State v. Blake*, 197 Wn.2d 170, 481

P.3d 521 (2021).

## FACTS

Bret Snow has been missing since late 2015. Snow's mother last spoke with him

on Thanksgiving Day in 2015. Snow and his mother talked every few weeks. Snow's

sister last saw him in mid-November 2015. She saw or talked to Snow several times per

week. Snow did not have a job, he used drugs, and lived in random places. In the months

before his disappearance, Snow spent a lot of time at a property on North Starr Road in

Newman Lake, Washington.

### North Starr Road drug conglomerate

Russell Joyce owned a house and a shop on North Starr Road. Joyce lived in an

apartment above the shop and rented out the remaining living spaces. Cheryl Sutton and

Ken Stone lived in the house. Guajardo stayed in a makeshift bedroom on the ground

floor of the shop. Guajardo, Sutton, and Stone all had keys to the shop.

Sutton, Stone, and Guajardo sold methamphetamine and heroin. Sutton oversaw

the drug business, while Stone and Guajardo were the "enforcers." Report of Proceedings

(RP)[1] at 400, 570. Enforcement in the drug community involves intimidation and

beatings. Snow sold drugs for Sutton, as did Colby Vodder.

Snow and Joyce were friends. Snow sold drugs to Joyce, which Joyce believed

came from Sutton. Sometime in 2015, Snow allegedly stole Sutton's van. He stayed

away from North Starr Road until Joyce convinced him to come back and face Sutton and

Stone.

---

[1] "RP" references are to the four volume set of verbatim report of proceedings numbered 1-875 unless otherwise indicated.

*Snow's disappearance*

On December 2, 2015, Snow's friend Karen Nelson gave him a ride to the North Starr Road property. Snow went to Joyce's apartment. According to Joyce, Sutton and Stone came running up the stairs and angrily burst in. Sutton held a steel bar in her hand and told Snow to get on the ground. Stone tied Snow up with a telephone cord. They called Guajardo up to the apartment. He punched Snow a couple times before the trio took him downstairs into the shop. Joyce called and texted Snow later but never heard from him again.

Snow sent a text message to Nelson at 4:25 a.m. on December 3. To send that message, Snow's phone accessed cell towers closest to the North Starr Road property. Nelson called and texted Snow back the next morning, but Snow's phone was off. No calls or text messages were received on Snow's phone after that morning.

Days later, Joyce heard noises downstairs in the shop. He said, "[I]t sounded like somebody was drilling through my wall from the shop side," and an hour or two later, he heard "what sounded like a chain being pulled through something metal." RP at 410-11. Joyce knocked on the door to the shop, and Guajardo answered, "just wait, just wait." RP at 411. Through the closed door, Vodder said he had poached a deer. Neither Guajardo nor Vodder allowed Joyce into the shop.

3

Sometime afterward, Joyce and Guajardo took a ride in Vodder's truck. Eventually, Guajardo stopped on the side of the road near open fields. Guajardo pulled his gun, pointed it at Joyce's face, and asked, "'Do we have to worry about you?'" RP at 414. Joyce said, "'Nope.'" RP at 414. Guajardo then fired his gun out the window before driving with Joyce back to the North Starr Road property.

On December 11, 2015, Guajardo was arrested and brought to Spokane County Jail.[2] He placed a phone call from jail to Sutton and Stone. Guajardo instructed Sutton to "Get rid of that shit." Ex. 68.

Sometime afterward, Sutton asked her friend, Derek Lyle, to bring her to a hotel in Airway Heights. Sutton told Lyle to "run in and grab a bucket behind the counter and bring it back out." RP at 635. Lyle heard liquid sloshing in the bucket. When they got back to North Starr Road, Sutton "did whatever she did with the bucket." RP at 636.

On December 15, 2015, Stone, Sutton, and Joyce were evicted from the North Starr Road property due to foreclosure. They gave the mattress that had been in Guajardo's bedroom to their friend, Nicole Price. Price moved the mattress to a storage facility in Post Falls, Idaho.

---

[2] It is unclear why Guajardo was arrested, but he was incarcerated until mid-January 2016. He was not arrested in this matter until May 2017.

4

Bret Snow's mother and sister filed a missing person report with the Spokane County Sheriff's Department. Detective Lyle Johnston obtained Snow's fingerprints, photograph, DNA,[3] dental records, and phone records. He sent multiple flyers to the media and forwarded Snow's information to national databases. Detective Johnston was never contacted after posting Snow's missing person information.

### *Law enforcement's investigation*

Detective Johnston first searched the North Starr Road property on January 15, 2016. The property had been vacated by Joyce, Stone, and Sutton and a new owner was remodeling the residence for sale. The shop had new plywood on the walls and the carpeting and flooring had been torn up. Detective Johnston did not find anything of evidentiary value.

Detective Johnston obtained phone records for Snow, Sutton, Stone, and Vodder. In the two months leading up to Snow's disappearance, there were 96 calls and 416 text messages between Sutton and Snow. Sutton never contacted Snow after December 3. Detective Johnston was unable to locate phone records for Guajardo during this period because he had multiple potential phones but none appeared to be "actually his." RP at

---

[3] Deoxyribonucleic acid. To develop a DNA profile, Detective Johnston gathered two hats from Snow's mother, as well as buccal swabs from his mother and siblings.

5

458.  Detective Johnston also searched Snow's social media and learned that "Mr. Snow had some personal items out in the community."  RP at 462.  He contacted the recipients of the items and recovered them.  Snow had left his electronic benefits transfer card and driver's license with a friend prior to Thanksgiving, and Detective Johnston recovered them in Montana.

Detective Johnston returned to North Starr Road on February 6, 2016, with a forensic specialist.  They took numerous photos but still did not find anything of evidentiary value.

On June 3, 2016, Detective Johnston, several forensic specialists, and a cadaver dog searched the North Starr Road property.  The cadaver dog indicated there were human remains behind a metal shelf in the shop.  The detective moved the shelving, which had been installed by the new owner, and saw water stains on the wall.  There was no water source around and no other wall had stains, which indicated the stains were likely from cleanup of a crime scene.

The forensics team performed several tests to determine whether blood had been present where the dog alerted.  One test indicated there may have been blood, while another came out negative.  Two dots of blood were identified: one near the base of a utility sink and another on top of the water heater.  Along another wall, the tests indicated

a streak of blood along with a visible patch of hair embedded into a crevice of the cement. In that area, there was heavily coagulated blood and a brown tint that appeared to be human tissue.

The detectives then tested for chemical cleaning agents. They found torn pieces of plastic and staples, indicating there had been a barrier that had been removed. There was no evidence of blood underneath.

Detective Johnston arrested Vodder in December 2016 for Snow's murder. He later arrested Sutton, Guajardo, and Stone. He was unable to recover any weapons from the scene. He did, however, find the SIM[4] card from Snow's cell phone in Sutton's belongings after her arrest. Snow's sister later found Snow's dog at Sutton's mother's house.

### *Christopher Schoonover*

Christopher Schoonover met Snow at North Starr Road. They both sold drugs for Sutton. On January 12, 2017, Detective Johnston interviewed Schoonover, who said he knew nothing about Snow's disappearance.

On May 25, 2018, Schoonover contacted Detective Johnston from jail in Idaho. He was in custody on possession charges and made a deal with the State to reduce his

---

[4] Subscriber identification module.

sentence in exchange for testifying against Sutton, Stone, Vodder, and Guajardo at their

separate trials. He provided Detective Johnston with the following information: Sutton's

and Stone's "demeanor" changed drastically at the end of 2015. RP at 572. In December

2015, Schoonover ignored a phone call from Sutton. Sutton then called with Vodder's

phone and asked Schoonover to "do something," which he refused to do. RP at 573.

After that call, Schoonover was concerned for Snow's safety.

Schoonover also said he talked to Guajardo in December 2015. Guajardo

allegedly told Schoonover:

> [Snow] had been struck in the head by Ms. Sutton with a lawn mower blade
> and that he had been taken in the back to the bedroom and finished and then
> taken back into the front area of the garage and cut into pieces and put into
> buckets and was taken to a pig farm.

RP at 574. Guajardo said that Snow had tried to rob Sutton and Stone earlier, and Stone

wanted to "finish him off." RP at 575. Guajardo admitted that he and Vodder assisted.

Guajardo told Schoonover that Snow was put on his bedroom mattress, covered with a

tarp, shot, stabbed, and then cut into several pieces.

### *Trial court proceedings*

On June 22, 2017, the State charged Guajardo with first degree felony murder

(predicated on first or second degree kidnapping), second degree felony murder

(predicated on first or second degree kidnapping), and conspiracy to commit first degree

8

kidnapping.  After discovery and various pretrial motions, the court set trial to commence

November 26, 2018.

*Motion to dismiss or suppress evidence*

On November 8, 2018, police learned that Price had Guajardo's mattress, which

might have been used during Snow's killing.  On November 13, Detective Johnston

located the mattress in a storage facility.  The mattress was stained despite being cleaned

by Price.  Initial testing indicated the presence of blood.  The next day, the State

submitted sections of the mattress to the Washington State Crime Laboratory.

On November 15, 2018, the State moved for a trial continuance to allow for blood

evidence testing, which it estimated would be complete by December 7.  It noted that

other testing was occurring at this time and could take longer depending on the initial

results and number of contributors.  The State set its motion for continuance to be heard

November 16.

At the hearing, Guajardo objected to a continuance and argued that "he shouldn't

have to delay his speedy trial because of newly discovered evidence."  RP (Nov. 16,

2018) at 4.  The State explained that Detective Johnston had talked to Price several times

before and had only just learned of the mattress.  The initial testing indicated blood, so the

State wanted to process the rest of the mattress.  The court granted the continuance for

good cause and reset the trial to commence December 10. On November 29, the trial

court reset the trial date to February 4, 2019.

On February 1, the crime lab informed the State its testing was complete and

would be peer reviewed by February 4. On February 4, the day trial was set to begin,

Guajardo filed a motion to dismiss the case or to suppress the DNA evidence from the

mattress. The court heard argument and explained its decision for denying Guajardo's

motion to dismiss:

> We have a missing person. DNA is critical. We didn't learn of this
> mattress, which is the subject of this motion, until November 8th, 2018.
> And at that point, it wasn't even known to the State that it still existed. . . .
> And then Detective Johnston immediately sought to find the
> mattress. He found the mattress within five days, by November 13, 2018.
> Within one day, November 14, 2018, the mattress was submitted to the
> crime lab. The crime . . . lab promised and did expedite the examination
> and testing. At the same time, however, it had other cases that were at least
> equally, if not more, pressing in terms of time constraints . . . . [T]he trial
> has only been continued about two months total since our first trial date. . . .
> I think that at this . . . point the court[ ] [has] done and the parties have done
> all that they can to keep this case on track to get tried. . . .
>  . . . .
> We're informed this morning, through law enforcement and from the
> State's attorney, that we're going to know sometime today what the
> outcome of that testing is. We don't even know now whether it's going to
> be exculpatory. . . . [I]t could be [as] exculpatory as it is inculpatory.
> On learning that, and at each juncture from the first discovery of the
> mattress, the State has immediately been in contact with Mr. Guajardo's
> lawyer, Mr. Jones, to inform him of the status of the progress with the
> mattress. . . .
>  . . . .

10

> . . . [T]he court has to find that it's probable that the State failed to act with due diligence, which is another way of articulating that first element of [CrR] 8.3. I find that the first element is not satisfied; that I cannot conclude that the State did not act with due diligence given the circumstances under which the mattress was discovered and the factors that I've already outlined. Therefore, I deny the motion to dismiss.

RP at 122-25.

The court explained, "I can't suppress whatever comes of the mattress, whether it be exculpatory or inculpatory, because, again, the State didn't fail to act with due diligence. So I don't find arbitrary action or governmental misconduct." RP at 125.

The crime lab determined the mattress contained a mixture of three individuals' DNA, which included Snow. The statistics indicated "it is 720,000 times more likely that the observed profile occurred as a result of a mixture of Bret Snow and two unknown contributors than if originated from three unrelated individuals . . . ." RP at 670. An additional blood sample from the mattress matched Guajardo.

The trial court continued Guajardo's trial to June 17, 2019. Snow's mother and sister, Joyce, Nelson, Price, Schoonover, Lyle, Detective Johnston, and other law enforcement and forensic specialists testified.

### *Jury instructions and verdict*

The trial court instructed the jury of its duty to reach a unanimous verdict. It also instructed:

11

A person commits the crime of murder in the first degree when he or she or an accomplice commits or attempts to commit first or second degree kidnapping and in the course of or in furtherance of such crimes he or she or another participant causes the death of a person other than one of the participants.

Clerk's Papers (CP) at 34.  The relevant portion of instruction 19 provided: "A 'participant' in a crime is a person who is involved in committing that crime, either as a principal or as an accomplice."  CP at 43.  Instruction 20 stated:

A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable.  A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of the crime.
A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:
(1) solicits, commands, encourages, or requests another person to commit the crime; or
(2) aids or agrees to aid another person in planning or committing the crime.
The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence.  A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime.  However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

CP at 44.  Guajardo did not object to the instructions.

The jury found Guajardo guilty of first degree felony murder and first degree kidnapping.  It found Guajardo was armed with a deadly weapon for the offenses.

12

*Sentencing*

The trial court discussed the comparability of Guajardo's out-of-state convictions and incorporated them in its oral ruling. The court found five California convictions comparable to Washington convictions. First, possession of a controlled substance in July 1996 was comparable to possession of methamphetamine in Washington, adding 1 point. Second, assault with a deadly weapon in July 1996 was comparable to second degree assault in Washington, adding 2 points. Third, evading a police officer in March 2000 was comparable to attempting to elude a pursuing police vehicle in Washington, adding 1 point. Fourth, taking a motor vehicle without consent in December 2004 was comparable to taking a motor vehicle without permission in the second degree in Washington, adding 1 point. Fifth, felon in possession of a shotgun in June 2011 was comparable to unlawful possession of a firearm in the second degree in Washington, adding 1 point. That conviction was accompanied by threat to another human being with a shotgun. The court found all out-of-state convictions had been proved by a preponderance of the evidence.

Guajardo's Washington convictions added 4 points to his score: 1 point for possession of a controlled substance in February 2017, 1 point for conspiracy to possess a

controlled substance in May 2015, 1 point for the current conviction, and 1 point for committing the current offense while on community custody.

The trial court calculated Guajardo's offender score as 9. Guajardo did not stipulate to his offender score but did not make specific arguments against it.

The State asked the court to find merger between the jury's verdicts for first degree kidnapping and first degree murder, which was predicated on kidnapping. It argued that for purposes of sentencing, merger was appropriate, but that because the intent for kidnapping and intent for murder were not necessarily the same, the State could argue that in the future. It concluded, "[T]here can be no punishment based solely on that first-degree kidnapping charge." RP at 858.

On July 19, 2019, the court sentenced Guajardo for first degree felony murder and ordered him to serve 572 months' imprisonment, including 24 months for the deadly weapon enhancement.

Guajardo appealed, and a panel of this court heard oral argument.

ANALYSIS

SUFFICIENCY OF EVIDENCE

Guajardo contends the State failed to present sufficient evidence to establish the corpus delicti for felony murder. We disagree.

14

"The doctrine of corpus delicti protects against convictions based on false confessions, requiring evidence of the 'body of the crime.'" *State v. Cardenas-Flores*, 189 Wn.2d 243, 247, 401 P.3d 19 (2017) (internal quotation marks omitted) (quoting *State v. Aten*, 130 Wn.2d 640, 655, 927 P.2d 210 (1996)).[5] The rule requires the State to produce independent evidence supporting a logical and reasonable interference that the crime the defendant confessed to actually occurred—a defendant's incriminating statement alone is insufficient. *Id.* at 253; *State v. Brockob*, 159 Wn.2d 311, 328, 150 P.3d 59 (2006); *State v. Sellers*, 39 Wn. App. 799, 803, 695 P.2d 1014 (1985); *see also State v. Dow*, 168 Wn.2d 243, 249, 227 P.3d 1278 (2010) ("a conviction cannot be supported solely by a confession"). The independent evidence need not establish the corpus delicti beyond a reasonable doubt or even a preponderance. Rather, it is sufficient if it prima facie establishes the corpus delicti. *Cardenas-Flores*, 189 Wn.2d at 258.

Corpus delicti is considered a rule of sufficiency and may be considered for the first time on appeal. *Id.* at 260-62. As with other sufficiency challenges, we assume the truth of the State's evidence and all reasonable inferences drawn therefrom. *Id.* at 264. The independent evidence is sufficient if it supports a logical and reasonable inference of

---

[5] During oral argument, the State conceded that Guajardo's statements to Schoonover were "confessions" for purposes of the corpus delicti rule because Schoonover received a reduced sentence for testifying.

the facts the State seeks to prove. *Brockob*, 159 Wn.2d at 328. The independent evidence must be consistent with guilt and inconsistent with a hypothesis of innocence. *Id.* at 328-29. We engage in the same inquiry as the trial court, reviewing de novo whether the State met its burden of production to satisfy the corpus delicti rule. *State v. Pineda*, 99 Wn. App. 65, 77-78, 992 P.2d 525 (2000).

Corpus delicti in homicide cases requires the State to prove "(1) the fact of death and (2) a causal connection between the death and a criminal act." *Aten*, 130 Wn.2d at 655. We address each element in turn.

### *Fact of death*

Guajardo contends the State failed to produce sufficient independent evidence that Snow is dead. He argues the independent evidence produced equally supports innocence as it does guilt. We disagree.

The State can rely on circumstantial evidence to prove the fact of death. *State v. Thompson*, 73 Wn. App. 654, 659, 870 P.2d 1022 (1994). "[D]irect proof of the killing or the production of the body" is not required for homicide convictions; that would be "manifestly unreasonable and would lead to absurdity and injustice." *State v. Lung*, 70 Wn.2d 365, 371, 423 P.2d 72 (1967). "'All that is required to prove death is circumstantial evidence sufficient to convince the minds of reasonable men of the

existence of that fact.'" *State v. Hummel*, 165 Wn. App. 749, 768, 266 P.3d 269 (2012)

(quoting *Lung*, 70 Wn.2d at 371).

Here, the circumstantial evidence supports a reasonable inference that Snow is

dead. Snow was last seen with Guajardo and his associates, and forensics identified

Snow's blood in the shop and on Guajardo's mattress.

Guajardo argues this evidence does not rule out a hypothesis of innocence—that

Snow was beaten and voluntarily fled. He argues the trace amounts of blood indicate a

beating not a murder. We disagree. Forensics found plastic used to prevent blood spatter

and opined the scene had been cleaned with chemicals. Plastic to prevent blood spatter

and use of chemicals to clean blood are more consistent with a killing than a mere

beating. Moreover, the fact that those involved in Snow's abduction routinely called him

before December 3, 2015, and did not call him after that date supports a reasonable

inference that they knew he was dead.

Guajardo next argues that Snow did not have a consistent home and it is not

unusual for transients to be alive but missing. We agree that Snow did not have a stable

residence and he sold and used drugs. But he spoke with his family regularly until early

December 2015, when he abruptly stopped returning calls or text messages.

17

The record does not support the hypothesis that Snow voluntarily fled. Snow does not own a car. He did not take his dog. Several state and national agencies had the missing person report, but nothing came of it. He was last seen being beaten by Guajardo, one of Sutton's enforcers. Snow's SIM card was found with Sutton. Snow's dog was found with Sutton's mother. These facts more strongly support the hypothesis that Snow is dead, rather than the hypothesis that he was beaten and he fled.

### *Causal connection*

Guajardo next argues the State failed to prove a causal connection between Snow's alleged death and a criminal act. We disagree.

The corpus delicti rule "does not require proof of a causal relation between the death and the accused." *Lung*, 70 Wn.2d at 371. Rather, the evidence must show that the death was "caused by someone's criminal act." *Cardenas-Flores*, 189 Wn.2d at 263. Again, we assume the truth of the State's evidence and all reasonable inferences drawn therefrom. *Id.* at 264.

Guajardo emphasizes that no cause of death was determined, there were no witnesses to an alleged murder, and the police failed to locate a murder weapon. But the circumstances of Snow's disappearance sufficiently establish a causal link between Snow's death and someone's criminal act. Guajardo hit Snow before he was forced

18

downstairs to the shop.  Days later, Joyce heard strange sounds in his apartment coming

from the shop downstairs.  The sound was like someone using a chain to hoist something.

When Joyce knocked on the shop door, Guajardo did not open the door and Vodder

claimed to have poached a deer.  Soon after, Guajardo took Joyce on a long ride

culminating in him pointing a gun at Joyce's face and asking if he was going to be a

problem.  After Joyce said "'Nope,'"[6] Guajardo punctuated the seriousness of his threat

by firing a shot in the air.

The State presented sufficient prima facie evidence that someone—Guajardo,

Vodder, or Sutton—committed a criminal act that caused Snow's death.  The State did

not need to locate Snow's body and perform an autopsy, it did not need to produce an

eyewitness, and it did not need to locate the murder weapon.  The State merely needed to

provide prima facie evidence that Snow was dead and that his death was caused by

someone's criminal act.  The State's evidence certainly meets this standard.

SUPPRESSION OF EVIDENCE

Guajardo contends the trial court erred by denying his CrR 8.3(b) motion to

dismiss the charges or suppress the DNA evidence from his mattress.  He argues the

crime lab's delay in testing and releasing the results forced him to choose between his

---

[6] RP at 414.

19

right to a speedy trial and his right to adequately prepared counsel. For the reasons set

forth below, we disagree.

We review CrR 8.3(b) rulings for abuse of discretion. *State v. Michielli*, 132

Wn.2d 229, 239-40, 937 P.2d 587 (1997). A court abuses its discretion when its decision

is manifestly unreasonable or based on untenable grounds. *State v. Salgado-Mendoza*,

189 Wn.2d 420, 427, 403 P.3d 45 (2017). We address Guajardo's dismissal and

suppression arguments in turn.

### *Dismissal*

Guajardo contends the trial court erred in denying his motion to dismiss the murder

charge because the DNA evidence injected "new facts" into the proceedings. Based on

the case law, we disagree.

Dismissal of charges pursuant to CrR 8.3(b) requires a defendant to establish by a

preponderance of the evidence: (1) an arbitrary action or governmental misconduct, and

(2) prejudice affecting the defendant's right to a fair trial. *Michielli*, 132 Wn.2d at 239-

40. Governmental misconduct "'need not be of an evil or dishonest nature'"; simple

misconduct supports the first prong. *Id.* at 239 (quoting *State v. Blackwell*, 120 Wn.2d

822, 831, 845 P.2d 1017 (1993)). To meet the second prong, a defendant must show

actual—not merely speculative or general—prejudice. *Salgado-Mendoza*, 189 Wn.2d at

431-32; *State v. Rohrich*, 149 Wn.2d 647, 657-58, 71 P.3d 638 (2003). Actual prejudice may result from late disclosure of material facts shortly before litigation. *Salgado-Mendoza*, 189 Wn.2d at 432.

Dismissal under CrR 8.3(b) is an extraordinary remedy reserved for egregious cases; it is improper absent material prejudice to the rights of the accused. *State v. Moen*, 150 Wn.2d 221, 226, 76 P.3d 721 (2003). A delay in production of evidence, even if attributable to the State's lack of due diligence, does not warrant reversal unless it interjects "'new facts' into the case which then causes the defendant to choose between two constitutional rights." *State v. Woods*, 143 Wn.2d 561, 584, 23 P.3d 1046 (2001).

Guajardo has not met his burden to warrant CrR 8.3(b) dismissal. He argues the crime lab's two and one-half month delay, when the actual testing only took 10 days, shows mismanagement satisfying the first prong. He does not provide citations to authority or the record supporting this assertion. In fact, the record shows the crime lab expedited the testing but had other high priority deadlines to meet. And even if the delay demonstrated a "lack of due diligence," the test results did not insert "new facts" into the proceedings.

The *Woods* court addressed a similar argument. There, the State said the DNA testing would be complete by October, but it was not completed until February of the next

year. *Id.* at 583. The four-month delay was partly due to the State having inadvertently frozen Woods's blood and a forensic scientist taking a vacation. *Id.* The court held this dilatory conduct did not warrant dismissal because Woods was not forced into "choosing between salvaging one constitutional right at the expense of another." *Id.* at 584. Citing *State v. Cannon*, 130 Wn.2d 313, 922 P.2d 1293 (1996), the court reasoned:

> Woods was placed on notice from the time of the charging that the State intended to use the results from forensic testing to prove that Woods was the perpetrator of the crimes. Although the State did not produce test results as promptly as it initially indicated that it would, the test results which were produced did not constitute new evidence that forced Woods to choose between two constitutional rights.

*Woods*, 143 Wn.2d at 584-85. The court affirmed Woods's convictions.

Similarly, the State promptly informed Guajardo when it found his mattress, it told him that a stain on the mattress tested positive for blood, and that the blood was sent to the crime lab for further testing. Because the State promptly notified Guajardo of these developments, the crime lab's test results did not inject "new facts" into the case.

Guajardo argues the "new facts" test in *Woods* is overly strict and urges this court to fashion a more realistic test. Abandoning precedent "is the prerogative of the state Supreme Court, not the Court of Appeals." *State v. Jussila*, 197 Wn. App. 908, 931, 392 P.3d 1108 (2017). We are bound by the Supreme Court and disregarding direct controlling authority would be error. *Id.*

22

*Suppression*

Guajardo alternatively contends the trial court erred in denying his motion to suppress the DNA evidence due to the crime lab's misconduct. While this argument is more persuasive, we ultimately find the trial court did not abuse its discretion here either.

In reviewing claims under CrR 8.3(b), a trial court may entertain a less severe remedy than dismissal. *City of Seattle v. Holifield*, 170 Wn.2d 230, 239, 240 P.3d 1162 (2010). Indeed, "'Dismissal is not justified when suppression of evidence will eliminate whatever prejudice is caused by the action or misconduct.'" *Salgado-Mendoza*, 189 Wn.2d at 431 (quoting *State v. McReynolds*, 104 Wn. App. 560, 579, 17 P.3d 608 (2000)).

Even assuming the crime lab's two and one-half month delay was misconduct, Guajardo still must establish prejudice. The prejudice contemplated by CrR 8.3(b) "includes the right to a speedy trial and the 'right to be represented by counsel who has had sufficient opportunity to adequately prepare a material part of his defense . . . .'" *Michielli*, 132 Wn.2d at 240 (quoting *State v. Price*, 94 Wn.2d 810, 814, 620 P.2d 994 (1980)).

Guajardo relies on *Michielli* to support his position. There, the State added four charges days before trial was set to begin on a single theft charge. *Id.* at 243. The State

admitted the additional charges were based entirely on information already known and described in the initial information. *Id.* The Supreme Court held, "The State's delay in amending the charges, coupled with the fact that the delay forced Defendant to waive his speedy trial right in order to prepare a defense, can reasonably be considered mismanagement and prejudice sufficient to satisfy CrR 8.3(b)." *Id.* at 245.

*Michielli* is inapposite. There, the State knew all of the information necessary to charge all five counts in its initial information, but for reasons unknown, waited until days before trial to add four new charges. Defense counsel was wholly unprepared to proceed to trial on the new charges and Michielli had to choose between a speedy trial and a prepared defense. Conversely, here, the State added no new charges. And as soon as it found the mattress, it informed Guajardo and sought expedited testing. Guajardo's counsel was not forced to prepare for "surprise charges brought three business days before [his] scheduled trial." *Id.* at 244. Rather, he knew for two months that the results could potentially link him to Snow. When that turned out to be true, Guajardo (properly) sought and the court granted a continuance to allow counsel to prepare.

We conclude that the trial court did not err in denying Guajardo's motion to dismiss or suppress the DNA evidence pursuant to CrR 8.3(b).

JURY UNANIMITY

Guajardo contends his state constitutional right to a unanimous verdict was violated when the jury was not given a unanimity instruction for it to decide whether he was a principal or an accomplice to the felony murder. The State argues Guajardo failed to preserve this error on appeal and has not demonstrated that it is one of manifest constitutional magnitude. We agree with the State.

It is well settled that parties may not assert a claim on appeal that was not first raised at trial. *State v. Strine*, 176 Wn.2d 742, 749, 293 P.3d 1177 (2013). This principle is embodied in RAP 2.5, which aims to "'afford[ ] the trial court an opportunity to rule correctly upon a matter before it can be presented on appeal.'" *Id.* (quoting *New Meadows Holding Co. v. Wash. Water Power Co.*, 102 Wn.2d 495, 498, 687 P.2d 212 (1984)). A party may, however, raise for the first time on appeal an issue involving a "manifest error affecting a constitutional right." RAP 2.5(a)(3). As our Supreme Court has explained,

> RAP 2.5(a)(3) is not intended to afford criminal defendants a means for obtaining new trials whenever they can identify some constitutional issue not raised before the trial court. Rather, the asserted error must be "manifest"—*i.e.*, it must be "truly of constitutional magnitude". The defendant must identify a constitutional error and show how, in the context of the trial, the alleged error actually affected the defendant's rights; it is this showing of actual prejudice that makes this error "manifest," allowing appellate review.

25

*State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995) (citation omitted).

A court must first determine whether the claimed error is a manifest constitutional error before addressing the substantive argument and conducting a harmless error analysis. *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009). This is because:

> The determination of whether there is actual prejudice is a different question and involves a different analysis as compared to the determination of whether the error warrants a reversal. In order to ensure the actual prejudice and harmless error analyses are separate, the focus of the actual prejudice must be on whether the error is so obvious on the record that the error warrants appellate review.

*Id.* at 99-100. "This distinction also comports with the common legal definition of 'manifest error': '[a]n error that is plain and indisputable, and that amounts to a complete disregard of the controlling law or the credible evidence in the record.'" *Id.* at 100 n.1 (quoting BLACK'S LAW DICTIONARY 622 (9th ed. 2009)).

Here, appellate review is not warranted under RAP 2.5(a) because the error, if any, was not manifest. We have previously held, "'There was no need for a unanimity instruction where accomplice liability allows a jury to convict as long as it finds that the elements of the crime were met, regardless of which participant fulfilled them.'" *State v. Holcomb*, 180 Wn. App. 583, 588, 321 P.3d 1288 (2014) (quoting *State v. Walker*, 178 Wn. App. 478, 488, 315 P.3d 562 (2013), *aff'd in part, rev'd in part*, 182 Wn.2d 463, 341

26

P.3d 976 (2015)).  Because Guajardo's argument is contrary to precedent binding on the trial court, the claimed error is not manifest and we decline to review it.

CONSTITUTIONALITY OF RCW 9A.08.020

Guajardo contends the accomplice liability statute is unconstitutionally overbroad because it criminalizes constitutionally protected speech.  The State responds that Guajardo failed to preserve this issue with a proper objection to the trial court's accomplice liability instruction or by arguing the issue below.  Again we agree.

As noted above, unpreserved error may be raised for the first time on appeal if it involves a manifest error affecting a constitutional right.  RAP 2.5(a)(3).  To be "manifest," the error must be "so obvious on the record that the error warrants appellate review."  *O'Hara*, 167 Wn.2d at 100.

The trial court's accomplice liability jury instruction was premised on RCW 9A.08.020(3), which provides in relevant part:

> A person is an accomplice of another person in the commission of a crime if: (a) With knowledge that it will promote or facilitate the commission of the crime, he or she: (i) Solicits, commands, encourages, or requests such other person to commit it; or (ii) Aids or agrees to aid such other person in planning or committing it . . . .

We have rejected similar overbreadth challenges to this statute.  *See, e.g.*, *Holcomb*, 180 Wn. App. at 589-90, *review denied*, 180 Wn.2d 1029, 331 P.3d 1172

(2014); *State v. Ferguson*, 164 Wn. App. 370, 264 P.3d 575 (2011), *review denied*, 173 Wn.2d 1035, 277 P.3d 669 (2012); *State v. Coleman*, 155 Wn. App. 951, 960-61, 231 P.3d 212 (2010), *review denied*, 170 Wn.2d 1016, 245 P.3d 772 (2011); *see also State v. McCreven*, 170 Wn. App. 444, 484-85, 284 P.3d 793 (2012) (rejecting overbreadth argument as it relates to accomplice liability jury instruction), *review denied*, 176 Wn.2d 1015, 297 P.3d 708 (2013).

Guajardo, recognizing that his argument is contrary to precedent, argues that *Holcomb* and its antecedents should be overturned. In making this argument, he tacitly concedes that the accomplice liability instruction given by the trial court was not obvious error. For this reason, the error is not manifest and we decline to review it for the first time on appeal.

COMPARABILITY OF CALIFORNIA CONVICTIONS

Guajardo contends the trial court erred in including two prior California convictions in his offender score. The State concedes that one conviction is not comparable but maintains the other was properly included. We discuss the relevant standards of review before addressing each conviction in turn.

We review the sentencing court's calculation of Guajardo's offender score de novo. *State v. Olsen*, 180 Wn.2d 468, 472, 325 P.3d 187 (2014). Prior out-of-state

convictions may be counted in an offender score if they are comparable to a Washington crime. RCW 9.94A.525(3). The State must prove the existence and comparability of all foreign convictions. *State v. Ford*, 137 Wn.2d 472, 480, 973 P.2d 452 (1999).

"'Comparability is both a legal and a factual question.'" *State v. Wilson*, 170 Wn.2d 682, 690, 244 P.3d 950 (2010) (quoting *State v. Collins*, 144 Wn. App. 547, 553, 182 P.3d 1016 (2008)). To determine whether an out-of-state crime is comparable, we apply a two-part test: first, we compare the elements of the out-of-state offense to the Washington statute in effect at the time. *Olsen*, 180 Wn.2d at 472-73; *In re Pers. Restraint of Lavery*, 154 Wn.2d 249, 255, 111 P.3d 837 (2005). "If the foreign conviction is identical to, or narrower than, the Washington statute, the foreign conviction counts toward the offender score as if it were the Washington offense." *Olsen*, 180 Wn.2d at 478. Second, if the foreign statute is broader than its Washington counterpart, we determine whether the defendant's conduct would have violated the comparable Washington statute. *Id.* In this step, we consider only facts that were previously admitted, stipulated to, or proved beyond a reasonable doubt. *State v. Davis*, 3 Wn. App. 2d 763, 772, 418 P.3d 199 (2018).

*Assault with a deadly weapon*

Guajardo was convicted under California's assault with a deadly weapon statute. The statute punished "any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury . . . . " Former CAL. PENAL CODE § 245(a)(1) (1993). Assault is defined as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." CAL. PENAL CODE § 240. In California, assault is a general intent crime. *People v. Williams*, 26 Cal. 4th 779, 788, 29 P.3d 197, 111 Cal. Rptr. 2d 114 (2001).

In Washington, assault is a specific intent crime. *State v. Stevens*, 158 Wn.2d 304, 314, 143 P.3d 817 (2006). That is, the State must prove a person had the specific intent either "'to cause bodily injury'" or "'to create reasonable fear and apprehension of bodily injury.'" *Id.* (quoting *State v. Eastmond*, 129 Wn.2d 497, 500, 919 P.2d 577 (1996)).

Guajardo could be convicted of the California assault without having been guilty of second degree assault in Washington. The Washington crime is narrower and is therefore not legally comparable. *See Lavery*, 154 Wn.2d at 255-56 (concluding second

30

degree robbery in Washington is not legally comparable to federal bank robbery because the former is specific intent while the latter is general intent).

We next consider whether the facts admitted, stipulated to, or proved beyond a reasonable doubt are comparable to Washington's second degree assault. We may look to the record of the foreign conviction to aid in our analysis, but "the elements of the charged crime must remain the cornerstone of the comparison." *State v. Morley*, 134 Wn.2d 588, 606, 952 P.2d 167 (1998). "Facts or allegations contained in the record, if not directly related to the elements of the charged crime, may not have been sufficiently proven in the trial." *Id.* A guilty plea is not an admission of the facts in the charging document. *State v. Bunting*, 115 Wn. App. 135, 141-42, 61 P.3d 375 (2003); *see also State v. Thomas*, 135 Wn. App. 474, 486, 144 P.3d 1178 (2006) ("Where facts alleged in the charging documents are not directly related to the elements, a court may not assume those facts have been proved or admitted.").

This prong is often difficult due to the requirement that we rely only on facts admitted, stipulated to, or proved beyond a reasonable doubt. As our Supreme Court has noted:

> Any attempt to examine the underlying facts of a foreign conviction, facts that were neither admitted or stipulated to, nor proved to the finder of fact beyond a reasonable doubt in the foreign conviction, proves problematic. Where the statutory elements of a foreign conviction are

31

> broader than those under a similar Washington statute, the foreign
> conviction cannot truly be said to be comparable.

*Lavery*, 154 Wn.2d at 258. This problematic tendency is illustrated here. Guajardo

agreed that the California sentencing court could consider police reports and other

documents as a factual basis for his guilty plea. The State did not provide these materials

to the trial court. Accordingly, the State did not prove factual comparability and this

California conviction should not have been counted in Guajardo's offender score. We

accept the State's concession and remand for resentencing.

### *Evading a police officer*

Guajardo pleaded guilty to evading a police officer in California, which provides:

> If a person flees or attempts to elude a pursuing peace officer in violation of
> Section 2800.1 and the pursued vehicle is driven in a willful or wanton
> disregard for the safety of persons or property, the person driving the
> vehicle, upon conviction, shall be punished by imprisonment . . . .

CAL. VEH. CODE § 2800.2(a). Section 2800.1 requires four conditions: "(1) a red light,

(2) a siren, (3) a distinctively marked vehicle, and (4) a peace officer in a distinctive

uniform." *People v. Hudson*, 38 Cal. 4th 1002, 1008, 136 P.3d 168, 44 Cal. Rptr. 3d 632

(2006). A "distinctive uniform" is "the clothing prescribed for or adopted by a law

enforcement agency which serves to identify or distinguish members of its force." *People*

*v. Mathews*, 64 Cal. App. 4th 485, 490, 75 Cal. Rptr. 2d 289 (1998).

32

The Washington statute in effect provided:

> Any driver of a motor vehicle who wilfully fails or refuses to immediately bring his vehicle to a stop and who drives his vehicle in a manner indicating a wanton or wilful disregard for the lives or property of others while attempting to elude a pursuing police vehicle, after being given a visual or audible signal to bring the vehicle to a stop, shall be guilty of a class C felony.

Former RCW 46.61.024 (1983). The signal "may be by hand, voice, emergency light, or siren. The officer giving such a signal shall be in uniform and his vehicle shall be appropriately marked showing it to be an official police vehicle." *Id.*

The statutes are legally comparable. They each require an attempt to flee or elude with willful or wanton disregard for the lives or property of others, a disregard for a peace officer's signal to stop via siren or lights, and an officer in uniform. If anything, the Washington statute is broader in that it permits the officer's signal to be by hand or voice, in addition to a light or siren.

Guajardo argues the charging document did not allege the uniform element and therefore the crimes are not legally comparable. He is correct that the charging document states only that "the peace officer's motor vehicle was operated by a peace officer," and does not contain the remaining statutory language regarding the uniform. CP at 184. But the complaint cites the proper section of the vehicle code, and the California and Washington statutes are legally comparable.

33

DOUBLE JEOPARDY

Guajardo contends the trial court erred by failing to dismiss the first degree kidnapping charge. He implies that the charge is a conviction, and the trial court was obligated to dismiss or vacate it.

The State notes that the trial court, in its judgment and sentence, did not refer to the jury's kidnapping verdict. The State nevertheless concedes that "this Court should remand with instructions to enter an order vacating the first-degree kidnapping." Br. of Resp't at 61.

Our federal and state constitutions protect an accused person "from being twice put in jeopardy for the same offense." *State v. Turner*, 169 Wn.2d 448, 454, 238 P.3d 461 (2010); *see* U.S. CONST. amend. V; U.S. CONST. amend. XIV, section 1; WASH. CONST. art. I, § 9. This prohibits courts from "imposing multiple punishments for the same criminal conduct." *Turner*, 169 Wn.2d at 454. The term "punishment" includes a conviction, even if no separate punishment is imposed. *Id.* at 454-55. The remedy for a double jeopardy violation is vacation of one of the underlying convictions. *State v. Womac*, 160 Wn.2d 643, 660, 160 P.3d 40 (2007).

A charge is not a conviction. But RCW 9.94A.030(9) defines a "conviction" as including a verdict of guilty. Guajardo fails to cite any authority to support his argument that a charge is a sufficient "punishment" to warrant vacation or dismissal.

Nevertheless, because the State concedes that the jury's guilty verdict should be vacated, we instruct the trial court to enter an order vacating the guilty verdict with respect to the charge of kidnapping in the first degree.

RESENTENCING PURSUANT TO *BLAKE*[7]

Guajardo contends he is entitled to resentencing pursuant to *Blake*, 197 Wn.2d 170, which held that Washington's possession of a controlled substance statute is unconstitutional. The State concedes this issue.

A prior conviction that is constitutionally invalid on its face may not be considered in a defendant's offender score. *State v. Ammons*, 105 Wn.2d 175, 187-88, 713 P.2d 719, 718 P.2d 796 (1986). "A conviction is facially invalid if constitutional invalidities are evident without further elaboration." *State v. Webb*, 183 Wn. App. 242, 250, 333 P.3d 470 (2014). The *Blake* court held a conviction for possession of a controlled substance is constitutionally invalid on its face. 197 Wn.2d at 186.

---

[7] This issue appears in the parties' supplemental briefing.

Guajardo's criminal history includes two possession-related offenses: a 2015 conviction for conspiracy to possess methamphetamine and a 2017 conviction for possession of methamphetamine. The 2017 conviction occurred when Guajardo was on community custody, which added 1 extra point to his offender score. Because the possession convictions are unconstitutional under *Blake*, we remand for the sentencing court to strike those convictions and the extra point added for the community custody violation from Guajardo's offender score.

DEPARTMENT OF CORRECTIONS (DOC) SUPERVISION COSTS[8]

Guajardo contends the trial court erred in imposing supervision fees because he is indigent. He challenges case law that narrowly interprets the prohibition on imposing costs on indigent defendants. The State argues supervision fees are not costs under the statute and therefore may be imposed on Guajardo at the trial court's discretion. We agree with the State.

RCW 10.01.160(3) prohibits sentencing courts from imposing costs on indigent defendants. "Costs shall be limited to expenses specially incurred by the state in prosecuting the defendant or in administering the deferred prosecution program . . . or pretrial supervision." RCW 10.01.160(2).

---

[8] This issue appears in the parties' supplemental briefing.

36

Division Two of this court has twice held that a sentencing court is not prohibited from imposing community supervision fees on an indigent defendant. *State v. Starr*, 16 Wn. App. 2d 106, 479 P.3d 1209 (2021); *State v. Spaulding*, 15 Wn. App. 2d 526, 536-37, 476 P.3d 205 (2020). We find those opinions persuasive: community supervision fees do not meet the statutory definition of "costs" and are therefore discretionary legal financial obligations. *Spaulding*, 15 Wn. App. 2d at 536.

The supervision fees challenged here were not specifically addressed on the record. They are standard fees in the felony judgment and sentence form, found in the middle of a lengthy paragraph describing the conditions of community custody. The trial court imposed a $500 victim's compensation assessment fee and waived the DNA collection fee due to Guajardo's criminal history. The court left the restitution fee—which was joint and several with Vodder, Sutton, and Stone—open for 180 days as requested. The court signed Guajardo's order of indigency.[9] The trial court may impose the DOC supervision fees at its discretion but the record is unclear as to whether it intended to. We remand to ensure it so intended.

---

[9] The court initially imposed the $200 filing fee based on Guajardo's ability to work while incarcerated, but later ensured it was not included due to Guajardo's order of indigency.

No. 36967-6-III
*State v. Guajardo*

Affirmed but remanded for resentencing.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____          _____
Siddoway, A.C.J.                          Fearing, J.